SCHIFF HARDIN LLP
MATTHEW B. MOCK (SBN 316380)
mmock@schiffhardin.com
5000 Birch Street
West Tower, Suite 3000
Newport Beach, CA 92660
Telephone: 949.623.2000
Facsimile: 949.623.2802

*Attorneys for Plaintiff*
*Nexus Pharmaceuticals, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| NEXUS PHARMACEUTICALS, INC., | Case No.  8:20-cv-1506-CJC-JDE |
| Plaintiff, | Hon. Cormac J. Carney |
| v. | **PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT** |
| CENTRAL ADMIXTURE PHARMACY SERVICES, INC., and B. BRAUN HOLDING GMBH & CO. KG, | [JURY TRIAL DEMANDED] |
| Defendants. | |

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

Plaintiff Nexus Pharmaceuticals, Inc. brings this action against Defendant Central Admixture Pharmacy Services, Inc. and B. Braun Holding GmbH & Co. KG (together, "Defendants") and alleges the following:

## I. NATURE OF THE ACTION

1.      Nexus brings this action to stop Defendants from unlawfully compounding and selling unapproved new drugs under the false guise that they are engaged in lawful "compounding." Federal and state law require drug manufacturers to demonstrate that their drugs are safe and effective in order to obtain regulatory approval to market them. Defendants purport to avoid drug-approval requirements by falsely presenting their products as lawfully "compounded" when in fact Defendants' products cannot lawfully be sold.

**A.      State Laws Against Unlawful and Unfair Business and Trade Practices**

2.      California's Unfair Competition Law ("UCL") exists to stop these types of unscrupulous practices by "prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Cal. Bus. & Prof. Code §§ 17001, 17200.

3.      Similarly, Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") also "protect[s] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). FDUTPA further forbids Defendants from

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

violating "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. Ann. § 501.203(3)(c).

4.     Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("PUTPL") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as unlawful. 73 Penn. Stat. § 201-3. According to the statute, "unfair methods of competition" induce, *inter alia*, "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." *Id.* § 201-2(4)(ii).

5.     Arizona's Unfair Competition Law ("AUCL") prohibits the "act, use or employment by any person of any . . . unfair act or practice . . . in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby." AZ Rev Stat § 44-1522.

6.     Connecticut's Unfair Trade Practices Act ("CUTPA") prohibits "unfair methods of competition" and "unfair [ ] acts or practices in the conduct of a trade or commerce." Conn. Gen. Stat. § 42-110b.

**B.     State Laws Prohibiting the Sale of Unapproved Drugs**

7.     California regulates the manufacture and sale of prescription drugs under the Sherman Food, Drug, and Cosmetic Law (the "Sherman Law"). As relevant here, the Sherman Law specifies that "[n]o person shall sell, deliver, or give away any new drug" that has not been approved by the California Department

of Health Services or the United States Food and Drug Administration ("FDA"). Cal. Health & Safety Code § 111550(a)–(b). The Sherman Law's drug-approval provision is designed to ensure that when Californians are treated with prescription drugs, they can rest assured that the products are safe and effective for their intended uses.

8.     California law also regulates drug compounders. California's Code of Regulations prohibits a pharmacy or pharmacist from compounding "a drug preparation that: . . . is a copy or essentially a copy of one or more commercially available drug products" unless that drug is on the drug shortage list and "the compounding of that drug preparation is justified by a specific, documented medical need made known to the pharmacist prior to compounding." 16 Cal. Code of Regs. § 1735.2(d)(3). The term "copy or essentially a copy" is further defined in the regulations: "'Copy or essentially a copy' of a commercially available drug product includes all preparations that are comparable in active ingredients to commercially available drug products, except that it does not include any preparations in which there has been a change, made for an identified individual patient, which produces for that patient a clinically significant difference, as determined by a prescribing practitioner, between that compounded preparation and the comparable commercially available drug product." *Id.* § 1735.1(k).

9.     Florida also regulates the manufacture and sale of prescription drugs under the state's Drug and Cosmetic Act. As relevant here, the Florida Drug and

Cosmetic Act specifies that no person may "sell, offer for sale, hold for sale, manufacture, repackage, distribute, or give away any new drug" that has not been approved by FDA. Fla. Stat. Ann. § 499.023. Florida's drug-approval provision is, similarly, designed to ensure that when Floridians are treated with prescription drugs, they can rest assured that the products are safe and effective for their intended uses.

10. The Connecticut Uniform Food, Drug and Cosmetic Act, Conn. Gen. Stat. § 21a-110, states: "No person shall sell, deliver, offer for sale, hold for sale or give away any new drug unless (1) an application with respect thereto has been approved under section 355 the federal act [the premarket approval requirement] . . ."

11. The Pennsylvania Controlled Substances, Drug, Devices, and Cosmetic Act states that "No person shall sell, deliver, offer for sale, hold for sale, or give away, any new drug unless (i) an application with respect thereto has been approved or a notice of claimed investigational exemption for a new drug has been filed under the appropriate Federal act."  P.L. 233, No. 64, § 10.

12. Arizona state law states that No person shall manufacture, sell, offer or hold for sale or give away any new drug or device unless it fully complies with the provisions of the federal act." AZ Rev Stat § 32-1962.

13. Defendants disregard these and other state laws respecting the distribution of unapproved drugs. Rather than invest the time and resources

necessary to research, develop, and test their products in order to ensure that they are safe and effective and to obtain regulatory approval to market them, Defendants are simply creating, marketing, and selling unapproved new drugs for unapproved uses throughout the United States, including California, Florida, Connecticut, Pennsylvania, and Arizona, under the false guise of "compounding."

**C.      Compounding and Defendants' Unlawful and Unfair Business and Trade Practices**

14.     "Compounding" is "a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient." Compounding and the FDA: Questions and Answers (Oct. 6, 2015); see also United States Pharmacopeia—National Formulary (USP-NF), General Chapter 1075, Good Compounding Practices. Defendants' compounding and marketing of standardized drugs is the antithesis of compounding.

15.     Defendants' business models are unlawful. Defendants are engaged in unlawful and unfair business and trade practices because Defendants are compounding and selling drugs in violation of the Sherman Law, the Florida Drug & Cosmetic Act, the Connecticut Uniform Food, Drug and Cosmetic Act, the Pennsylvania Controlled Substances, Drug, Devices, and Cosmetics Act, and Arizona state law. These laws prohibit the sale of drugs not approved by FDA.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

16. Testing new drugs and obtaining the legally required regulatory approval to sell them is time-consuming and very costly. Ignoring drug-approval requirements provides Defendants an unfair competitive advantage over law-abiding pharmaceutical manufacturers like Nexus. Worse, it puts patients at risk by exposing them to drugs that have not been shown to be safe or effective.

17. Defendants purport to sell their unproven and unapproved drugs as lawfully "compounded" drugs. In reality, however, Defendants are engaged in nothing more than unlawful drug compounding.

18. Compounding is typically appropriate when the medical needs of an individual patient cannot be met by a commercially available, approved medication. If a patient has an allergy and needs a medication to be made without a certain dye, for example, compounding may be appropriate. Or if an elderly patient or a child cannot swallow a pill and needs a medicine in liquid form that is commercially available only in tablet form, a compounded drug may warrant clinical consideration. Compounding is thus traditionally a one-to-one service: a pharmacy dispenses a single compounded drug to a single patient according to a unique prescription tailored to the individual patient's medical needs.

19. Because compounding occurs on the small scale of individual, patient-specific prescriptions tailored to meet medical needs that cannot be met by commercially available, approved drugs, it is generally not practical for compounded drugs to undergo the clinical trials generally required to obtain

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

regulatory approval to market a new drug. And the small scale of compounding means that the risks to public health posed by unapproved compounded drugs are correspondingly limited to the select individuals who receive them. To preserve traditional compounding as a way to treat patients whose needs cannot be met by commercially available, approved drugs, state and federal law permit compounded drugs, in limited circumstances, to forgo approval by state health departments or FDA.

20.     Nexus fully recognizes the value and legal legitimacy of traditional compounding and does not, through this suit, seek to restrict such legal traditional compounding. But when companies like Defendants misuse these narrow exemptions to mass compound and market standardized drugs of unknown quality under the guise of compounding, thousands of patients may be at risk. Such mass compounding and marketing of unapproved drugs undermines the drug-approval requirements that are central to the protection of the public from drugs that may be unsafe, ineffective, or both.

21.     Unlike Nexus and other law-abiding pharmaceutical manufacturers, Defendants falsely claim to be engaged in lawful compounding and thus to be exempt from state and federal approval requirements. By ignoring drug-approval requirements, Defendants are profiting at the expense of public health.

## D. **The Importance of Drug Approval and the Purpose of this Action**

22. Federal and state law require approval for new drugs for good reason. Drug approval is evidence-based, and it is essential to ensure the quality, safety, and effectiveness of new drugs. When companies circumvent the drug-approval process, safety and efficacy are, at best, unknown. The danger is not merely theoretical, as manufacturing and distribution of unapproved new drugs of unknown quality in the guise of compounding has endangered or adversely impacted public health. For example, in 2012, 753 patients in 20 states were diagnosed with a fungal infection after receiving injections of preservative-free methylprednisolone acetate manufactured by New England Compounding Center in Massachusetts. Of those 753 patients, the U.S. Centers for Disease Control and Prevention reported that 64 patients in nine states died, though other sources report the death toll as exceeding 100 victims. In response to this disaster, Congress passed amendments to the FDCA increasing regulation on compounding pharmacies.

23. Nexus brings this action under the UCL, FDUPTA, CUTPA, PUTPL, and AUCL to stop Defendants from unlawfully compounding, marketing, selling, and distributing unapproved new drugs. Nexus seeks a declaration that Defendants' business practices violating the UCL, FDUPTA, CUTPA, PUTPL, and AUCL by compounding, distributing, and selling unapproved new drugs and an injunction prohibiting Defendants from committing such violations. *See* Cal. Bus. & Prof.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

Code § 17200; Cal. Health & Safety Code § 111550(a)–(b); Fla. Stat. §§§ 499.005, 499.023, 501.203(3)(c); Conn. Gen. Stat. § 21a-110, 42-110b; AZ Rev Stat § 44-1522; 73 Penn. Stat. § 201-3; *cf.* 21 U.S.C. § 331(a).

24.     Nexus notified Defendants by letter that it has received FDA approval for its EMERPHED™ product, and that Defendants' continued compounding, sales, and distribution of its compounded ready-to-use ephedrine sulfate product violated state and federal law. Defendants responded to the letter by asserting that its actions do not violate the law because they compound using the concentrated ephedrine sulfate drug products instead of bulk compounding. Defendants do not deny that their products are otherwise essentially a copy of Nexus's FDA-approved products. Defendants have refused to cease their activities, and have knowingly and willfully continued their unfair business practices.

25.     Nexus further seeks actual damages that it has incurred as a result of Defendants' unlawful business practice tactics, plus attorneys' fees and court costs. *See, e.g.*, Fla. Stat. Ann. § 501.211(2); Conn. Gen. St. § 42-110g.

## II.  THE PARTIES

26.     Nexus is a corporation organized and existing under the laws of the State of Illinois. Its principal place of business is located at 400 Knightsbridge Parkway, Lincolnshire, Illinois 60069.

27.     Nexus has invested significant time and resources to research, develop, manufacture, and test both the finished drug product EMERPHED™ and the

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

- 10 -

corresponding active ingredient, bulk ephedrine sulfate, to obtain regulatory approval from FDA to market its EMERPHED™ for the treatment of clinically important hypotension occurring in the setting of anesthesia.

28.    EMERPHED™ is the only FDA-approved ready to use ephedrine sulfate product in the United States.

29.    Nexus markets and sells its EMERPHED™ product to medical facilities and customers that are located in California, Florida, Connecticut, Pennsylvania, and Arizona.

30.    On information and belief, Defendant Central Admixture Pharmacy Services, Inc. is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is located at 16800 Aston St., Suite 150 Irvine, California 92606.

31.    On information and belief, Defendant B. Braun Holding GmbH & Co. KG is a corporation organized and existing under the laws of Germany. Its principal place of business is located at Carl-Braun-Straße 1, 34212 Melsungen, Germany. According to publicly available information, Defendant B. Braun Holding GmbH & Co. KG is the parent corporation of Defendant Central Admixture Pharmacy Services, Inc.

32.    Defendants sell their unapproved drug products throughout California, including in this judicial District (which is the most populous in the State of

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

- 11 -

California), and in Florida, Connecticut, Pennsylvania, and Arizona, including unapproved ready-to-use ephedrine sulfate drug products.

## III.  JURISDICTION AND VENUE

33.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332. The parties are citizens of different States (¶¶ 26-32, *supra*), and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs (¶¶ 85-128, *infra*).

34.    This Court has personal jurisdiction over Defendants. Defendant Central Admixture Pharmacy Services, Inc. is headquartered in California. Defendants operate multiple compounding facilities within California. Defendants have been engaging in business in this District and shipping unapproved drugs in to California and this District, and Defendants are violating California statutes within this Districts. Defendants are registered to do business in California. Defendants have registered with, and received licensure from, the California State Board of Pharmacy. Defendants have had their 503B facilities inspected by the California State Board of Pharmacy. In substantial part, Nexus's claims arise out of or relate to Defendants' activities in this District.

35.    Venue in this District in proper under 28 U.S.C. § 1391.

## IV.  FACTUAL ALLEGATIONS

**A.  Nexus Sells the Only FDA-Approved Ready-to-Use Ephedrine Sulfate Product**

36.     It is common practice to administer anesthesia to patients undergoing surgical procedures. One side effect of many anesthesia drugs is hypotension, or lowering of blood pressure. If the blood pressure drops too far, then this can risk complications during surgery, including death.

37.     The FDA has approved the drug ephedrine sulfate for use in surgical settings to raise blood pressure when a patient under anesthesia begins experiencing hypotension severe enough to affect the patient's health.

38.     However, until 2020 all FDA-approved forms of ephedrine sulfate were provided in a concentrated form of 50 mg/mL. In other words, the FDA-approved products required the hospital pharmacy, nursing staff, or doctors to dilute the vial with saline or another liquid down to the appropriate concentration of 5 mg/mL before the drug could be administered to a patient. The requirement to dilute a concentrated drugs introduces increased risk of contamination or error, both of which can be dangerous to patient health.

39.     To address this problem, Nexus submitted New Drug Application ("NDA") No. 213,407 to the FDA for approval of its ready-to-use ephedrine sulfate product at a concentration of 5 mg/mL. Nexus invested significant resources over several years to prepare NDA No. 213,407.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

40. The FDA approved Nexus's NDA No. 213,407 on April, 17, 2020 under the trade name EMERPHED™. Nexus's EMERPHED™ product is the only FDA-approved ready-to-use ephedrine sulfate product on the market in the United States.

## B. Defendants' Activities Violate State and Federal Drug-Approval Provisions

### 1. California, Florida, Connecticut, Pennsylvania, and Arizona state law requires FDA approval

41. Defendants'compounding, marketing, sale, and distribution of unapproved new drugs, under the guise of compounding, is unlawful.

42. Under California law, a new drug may not be introduced or delivered for introduction into interstate commerce unless an application approved by FDA under section 505 of the FDCA is in effect for the drug. *See* Cal. Health & Safety Code § 111550(a).

43. California's Sherman Law provides that "[n]o person shall sell, deliver, or give away any new drug" that has not been approved by FDA or by the State of California. Cal. Health & Safety Code § 111550(a)–(b).

44. The Sherman Law incorporates "[a]ll regulations relating to . . . new drug applications . . . adopted pursuant to Section 505" of the FDCA. *Id.* § 110110(a).

45.     California's Sherman Law and the FDCA's definitions of "drug" and "new drug" are the same. See id. § 109925(c) (drug), § 109980 (new drug); 21 U.S.C. § 321(g)(1), (p).

46.     California's Sherman Law incorporates the FDCA's requirement that pharmaceutical manufacturers must obtain approval before selling a new drug. *See* Cal. Health & Safety Code § 110105; 21 U.S.C § 355(a).

47.     California's Code of Regulations separately prohibits the compounding of a product that is a copy or essentially a copy of an approved drug, unless that drug is on a drug shortage list. 16 Cal. Code of Regs. §§ 1735.1(k), 1735.2(d)(3).

48.     Florida's Drug and Cosmetic Act provides that no person may "sell, offer for sale, hold for sale, manufacture, repackage, distribute, or give away any new drug" that has not been approved by FDA. Fla. Stat. Ann. § 499.023.

49.     Florida's Drug and Cosmetic Act's and the FDCA's definitions of "drug" and "new drug" are the same. Fla. Stat. Ann. § 499.003(17) (drug), § 499.003(32) (new drug); 21 U.S.C. § 321(g)(1), (p).

50.     The Connecticut Uniform Food, Drug and Cosmetic Act states that "no person shall sell, deliver, offer for sale, hold for sale or give away any new drug unless an application with respect thereto has been approved under Section 355 of the federal act [the premarket approval requirement]." Conn. Gen. Stat. § 21a-110.

51.    The Pennsylvania Controlled Substances, Drug, Devices, and Cosmetic Act states that "No person shall sell, deliver, offer for sale, hold for sale, or give away, any new drug unless (i) an application with respect thereto has been approved or a notice of claimed investigational exemption for a new drug has been filed under the appropriate Federal act."  P.L. 233, No. 64, § 10.

52.    Arizona state law states that "No person shall manufacture, sell, offer or hold for sale or give away any new drug or device unless it fully complies with the provisions of the federal act." AZ Rev Stat § 32-1962. The "federal act" in Arizona law refers to the FDCA.

53.    Defendants are violating California's Sherman Law, Florida's Drug and Cosmetic Act, the Connecticut Uniform Food, Drug and Cosmetic Act, the Pennsylvania Controlled Substances, Drug, Devices, and Cosmetic Act, and Arizona Revised Statute § 32-1962 because they have not obtained the approval of FDA (or any other relevant regulatory authority) to introduce the compounded ready-to-use ephedrine sulfate drug products that they make, market, sell, and distribute.

**2.    Section 503B precludes the sale of drugs that are "essentially a copy" of an approved drug**

54.    Defendants formulate, make, manufacture, market, sell, and distribute unapproved new drugs that they claim are lawful "compounded" drugs. Defendants market dozens of drugs as alternatives to FDA-approved drugs throughout the

- 16 -

United States, including California, Florida, Connecticut, Pennsylvania, and Arizona. Defendants' drugs include a compounded ready-to-use ephedrine sulfate drug product, which they make by diluting concentrated ephedrine sulfate products down to the same strength as Nexus's FDA-approved product.

55.    Defendants have represented to Nexus that they do not manufacture their ready to use ephedrine sulfate product using bulk drug substance.

56.    Defendants do not have an approved New Drug Application or Abbreviated New Drug Application for any ephedrine sulfate drug product.

57.    Defendants purport to avoid the need for compliance with 21 U.S.C. § 355(a) pre-market approval by relying on Section 503B of the FDCA, 21 U.S.C. § 353b.

58.    Enacted in 2013 as part of the Drug Quality and Security Act, Section 503B of the FDCA limits the circumstances in which a drug product may be compounded. In order to be lawfully compounded, distributed, and dispensed, a drug product must be compounded in accordance with the statutory requirements at a facility that is registered with, and inspected by, the FDA. 21 U.S.C. § 353b(a)-(b).

59.    A Section 503B outsourcing facility or a compounding pharmacy may obtain the active pharmaceutical ingredients from which it makes compounded drugs in two ways: (1) by purchasing and altering a finished, FDA-approved drug

product; or (2) by purchasing bulk drug substances and using those bulk substances to create the drugs.

60.     Among its statutory requirements, Section 503B prohibits the compounding and sale of any drug that is essentially a copy of an approved drug. 21 U.S.C. § 353b(a)(5). This requirement is separate from the requirements related to bulk compounding, and so apply also to compounders who purchase an FDA-approved product to reformulate it into a drug product that is identical or nearly identical to an approved drug. *Id.* § 353b(d)(1).

61.     Section 503B first defines a compounded drug to be essentially a copy of an approved drug if it is identical or nearly identical to the approved drug product, unless that approved drug appears on the drug shortage list. 21 U.S.C. § 353b(d)(1). Separately, Section 503B defines a compounded drug to be essentially a copy of an approved drug if a component of that compounded drug is a bulk drug substance that is also a component of an FDA-approved drug, "unless there is a change that produced for an individual patient a clinical difference, as determined by the prescribing practitioner, between the compounded drug and the comparable approved drug." 21 U.S.C. § 353b(d)(2).

62.     In January 2018 the FDA issued a Guidance for Industry explaining its interpretation of the statutory "essentially a copy" definition for Section 503B outsourcing facilities using FDA-approved products:  "If a compounded drug product is identical or nearly identical to an approved drug that is not on FDA's

Schiff Hardin LLP
Attorneys At Law
Newport Beach

- 18 -

drug shortage list at the time of compounding, distribution, and dispensing, the compounded product is essentially a copy, and an outsourcing facility may not produce it under section 503B." Ex. 1, U.S. Food & Drug Admin*., Compounded Drug Products That Are Essentially Copies of Approved Drug Products Under Section 503B of the Federal Food, Drug, and Cosmetic Act Guidance for Industry* at 6 (January 2018).

63. The FDA identified five characteristics of a compounded drug product it intends to consider when evaluating whether that compounded drug product is "identical or nearly identical to an approved drug:" (1) active ingredient, (2) route of administration, (3) dosage form, (4) dosage strength, and (5) excipients. *Id.* at 6. The FDA notes for route of administration that "if the approved drug can be used (regardless of how it is labeled) by the same route of administration prescribed for the compounded drug, we intend to treat the compounded drug as though it has the same route of administration for purposes of this analysis." *Id.* at 6, n.13. For the evaluation of excipients, the FDA notes that for some products,

> information about the excipients contained in an approved drug is not publicly available and not known to the outsourcing facility. In such cases, FDA does not intend to consider whether the compounded drug has the same excipients that the approved drug is labeled to contain in determining whether a compounded drug is identical or nearly identical to an approved drug.

*Id.* at 6, n.15.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

64.   The FDA Guidance also notes that for a drug product that is identical or nearly identical to an approved drug product, there is no exemption for a prescriber request: "Under section 503B(d)(2)(A), the identical or nearly identical compounded product cannot be exempted from the copying restriction by a prescriber determination that there is a change to the compounded product that produces a clinical difference for an individual patient." *Id.* at 7.

65.   FDA's Guidance also provides: "An order that only identifies the product formulation, without more information, would not be sufficient to establish that the determination described by section 503B(d)(2)(B) has been made." *Id.* And, "[i]f a prescription identifies only a patient name and product formulation, this would not be sufficient to establish that the determination described by section 503B(d)(2)(B) has been made.

66.   The FDA Guidance notes that the term "dosage form" refers to "the way of identifying the drug in its physical form." *Id.* For dosage form, the FDA also provides a link to its official list of dosage forms that may be submitted in a NDA or ANDA. *Id.* at 6, n.14. The term dosage form as used in the statute and FDA Guidance refers to the physical form of the drug product, i.e., injection solution, and not the container closure system, i.e., vial or syringe.

67.   If a compounded drug product is identical or nearly identical to an FDA-approved drug, then it is not exempt from FDA approval requirements, even if it is not bulk compounded, unless it is on the drug shortage list. 21 U.S.C.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

§ 353b(a); Ex. 1 (FDA Guidance) at 6-7, 14. The FDA publicly maintains the drug shortage list. U.S. Food & Drug Admin., "Current and Resolved Drug Shortages and Discontinuations Reported to FDA," available at: https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm (last visited July 30, 2020).

68.     Title 21 U.S.C. § 353b(a) provides an exemption from the drug-approval requirements for "outsourcing facilities" registered with FDA only "if each of [eleven] conditions are met." The last of those conditions, 21 U.S.C. § 353b(a)(11), requires that the drug be "compounded in an outsourcing facility in which the compounding of drugs occurs *only* in accordance with [section 353b]." (emphasis added). That is, if *any* drug compounded in an outsourcing facility does not comply with all of Section 503B's conditions, then *none* of the drugs produced in that outsourcing facility are exempt from the FDA's drug-approval requirements.

**3.     Defendants' drugs are not exempted from FDA approval under Section 503B because Defendants' products are essentially a copy of Nexus's FDA-approved Product**

69.     Defendants operate FDA 503B outsourcing facilities in California, Arizona, and Pennsylvania. Defendants are engaged in the unlawful compounding and sale of drugs because they are compounding a ready to use ephedrine sulfate product in their 503B outsourcing facilities that (1) is essentially a copy of Nexus's

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

- 21 -

FDA-approved ephedrine sulfate product and (2) Nexus's FDA-approved ephedrine sulfate product is not on FDA's shortage list.

70.     Defendants sell a ready-to-use ephedrine sulfate product. Defendants' Product Catalog, dated April 2020, lists product numbers 6003-1 for Ephedrine 5 mg/mL in 0.9% Sodium Chloride 5mL in 5mL BD Syringe and 6003-2 for Ephedrine 5 mg/mL in 0.9% Sodium Chloride 10mL in 10mL BD Syringe for sale to customers. Ex. 2, CAPS, *April 2020 Product Catalog*, at 6.   Defendants do not purchase Nexus's FDA-approved EMERPHED™ product and alter it to make the compounded ready-to-use ephedrine sulfate drug products they sell to physicians and medical facilities.

71.     Defendants ship its compounded ready-to-use ephedrine sulfate drug products from one or more 503B facilities to physicians and medical facilities around the country, including to California, Florida, Connecticut, Pennsylvania, and Arizona, with the knowledge that physicians and medical facilities in those states prescribe, sell, dispense, and/or administer the compounded ready-to-use ephedrine sulfate drug products to patients in those states.

72.     Defendants have represented that they do not compound their ready to use ephedrine sulfate product using bulk drug substances. Defendants have represented that they do not use bulk drug substances because they recognize that this practice would be unlawful under Section 503B and the FDA Guidance.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

- 22 -

73. Defendants' compounded ready-to-use ephedrine sulfate drug product sold from its 503B outsourcing facilities is "identical or nearly identical" to Nexus's FDA-approved EMERPHED™ drug product under 21 U.S.C. § 353b(d)(1). The two drug products have the same active pharmaceutical ingredient, route of administration, dosage form, dosage strength, and, to the extent relevant, excipients. Both products contain the active ingredient ephedrine sulfate; are to be used for intravenous injection; are formulated into solutions for injection; are formulated at a strength of 5 mg/mL, and contain the same relevant excipients.

74. Because Defendants' compounded ready-to-use ephedrine sulfate drug product is identical or nearly identical to Nexus's EMERPHED product, Defendants may only compound, distribute, and dispense its compounded product if Nexus's ephedrine sulfate product is on the drug shortage list. 21 U.S.C. § 353b(d)(1).

75. The FDA publicly maintains its drug shortage list. U.S. Food & Drug Admin., "Current and Resolved Drug Shortages and Discontinuations Reported to FDA," available at: https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm (last visited July 30, 2020). Ephedrine sulfate does not currently appear on the drug shortage list. Ephedrine sulfate has not appeared on the FDA's drug shortage list at any time since Nexus received FDA approval for its NDA No. No. 213,407 on April, 17, 2020.

76.     Because Defendants' compounded ready-to-use ephedrine sulfate drug product sold from its 503B outsourcing facilities is identical or nearly identical to Nexus's FDA-approved EMERPHED™ drug product, and Nexus's product does not appear on the FDA drug shortage list, Defendants' products are essentially a copy of an approved product and violate the requirements for exemption from drug approval in Section 503B.

77.     Because Defendants violates the "Essentially a Copy" prohibition, Defendants' compounding and sale of ready-to-use ephedrine sulfate violates 21 U.S.C. § 353b(a)(5). This means that Defendants' outsourcing facilities are not compounding drugs only in accordance with Section 503B. Therefore, no drug produced in those outsourcing facilities is eligible for the exemption from FDA's drug approval requirements. 21 U.S.C. § 353b(a)(11).

## C.     Defendants' Business and Trade Practices Jeopardize Public Health

78.     Defendants' unfair competition jeopardizes public health. The FDA has acknowledged that compounded drugs pose a higher risk to patients than FDA-approved drugs because they have not undergone FDA premarket review for safety, effectiveness, and quality. Ex. 3, U.S. Food & Drug Admin., *FDA's Human Drug Compounding Progress Report*, at 2, 4-5 (2017). Moreover, the FDA has stated: "Because they are subject to a lower regulatory standard, compounded drugs should only be distributed to health care facilities or dispensed to patients to fulfill the needs of patients whose medical needs cannot be met by an FDA-approved drug."

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

Ex. 1 (FDA Guidance) at 3. In addition, the FDA has stated that allowing the sale of compounded versions of drugs that are "essentially a copy" of an FDA-approved drug "would unnecessarily expose patients to drug products that have not been shown to be safe and effective." *Id.* at 4.

79.     Defendants' 503B outsourcing facilities have been cited by the FDA for numerous violations involving lack of safety, appropriate product labeling, sterilization and safe manufacturing practices.  For example, after an inspection of the California facility, Defendants received a Form FDA-483 identifying two observed violations, including failure to thoroughly investigate complaints of ineffective drug products. Ex. 4, February 2016 FDA Observation Report. After inspection of the Pennsylvania facility, Defendants received a Form FDA-483 identifying eight observed violations, including violations of appropriate clean room conditions and failure to properly follow microbiological sterilization procedures. Ex. 5, July-August 2018 FDA Observation Report.

**D.     Nexus Has Been Injured by Defendants' Unlawful and Unfair Competition**

80.     Defendants' actions are harming the public by unfairly competing with Nexus.

81.     The FDA has acknowledged that allowing compounded drugs that are essentially a copy of FDA-approved drugs risks undermining the new drug and abbreviated new drug approval process. The FDA has found that "[s]ponsors would

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

be less likely to invest in, and seek approval of, innovative, life-saving medications if an outsourcing facility could, after a drug is approved, compound 'substitutes' that may be less expensive because they have not gone through the drug approval process." Ex. 1 (FDA Guidance) at 4.

82.    Nexus is the only FDA-approved supplier in the United States of a ready-to-use ephedrine sulfate drug product.

83.    As a result of Defendants' unlawful and unfair competition, Nexus has been deprived of money or property and has suffered damages in the form of the sales and market share that have been diverted from Nexus to Defendants. Because the demand for ready to use ephedrine sulfate is inelastic and there are no substitute, each purchase of a vial of unlawfully compounded ready-to-use ephedrine sulfate from Defendants would have been a purchase of a vial of Nexus's FDA-approved EMERPHED™ but for Defendants' unlawful and unfair competition.

84.    Defendants use of FDA-approved concentrate product undermines fair competition and discourages other companies from engaging in the appropriate FDA drug approval process. In essence, Defendants have engaged in an end run around the drug application process by creating copies of Nexus's FDA-approved product using a different product as the starting point. If Defendants wish to produce a ready to use ephedrine sulfate product that is essentially a copy of Nexus's product, then they may file an ANDA and seek FDA approval for their

Schiff Hardin LLP
Attorneys At Law
Newport Beach

product. The ANDA approval process is more costly and time consuming than creating an unapproved, compounded version of Nexus's FDA-approved product. Defendants' refusal to either cease operations or engage in the FDA approval process is the precise behavior FDA warned against in its guidance:  "Sponsors would also be less likely to seek approval of an ANDA for a generic drug if outsourcing facilities were permitted to compound drugs that are essentially copies of approved drugs without going through the ANDA process." Ex. 1 (FDA Guidance) at 4. Defendants' actions not only harm Nexus, they also discourage other companies from filing for FDA approval. This harms the market and public.

## V.  CLAIMS FOR RELIEF

### COUNT ONE

### Violation of California's Unfair Competition Law ("UCL")

### (Cal. Bus. & Prof. Code § 17200, *et. seq.*)

85.    Nexus realleges and incorporates by reference each and every allegation set forth in paragraphs 1-84 above, as if fully stated herein.

86.    Defendants' practices, as described in this Complaint, constitute unlawful and/or unfair business practices in violation of California's UCL, Cal. Bus. & Prof. Code 17200, *et seq*.

87.    Defendants' products are "drugs" under California and federal law, namely Cal. Health & Safety Code sections 109925(b)-(c), 110110, and 21 U.S.C. § 321(g)(1) and 21 C.F.R. § 310.527(a), because they are intended to cure, mitigate,

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

treat, or prevent disease and/or affect the structure and/or function of the human body and are promoted by Defendants for those purposes and used by healthcare professionals and consumers in California for those purposes.

88.    Defendants' products are "new drugs" under California law, namely Cal. Health & Safety Code section 109980, and 21 U.S.C. § 321(p)(1) and 21 C.F.R. § 310.527(a), as incorporated by Cal. Health & Safety Code section 110110, because they are not generally recognized by qualified experts as safe and effective for their intended uses.

89.    Defendants' products have not been approved by FDA or by the California Department of Health Services as required by Cal. Health & Safety Code sections 111550(a)-(b).

90.    Defendants have violated the UCL by engaging in the unlawful business practice of marketing, selling, and distributing their products in violation of the California Sherman Law.

91.    Defendants have violated the UCL by engaging in the unlawful business practice of compounding products that are copies or essentially copies of Nexus's approved product in violation of the California Code of Regulations. 16 Cal. Code of Regs. §§ 1735.1(k), 1735.2(d)(3).

92.    Defendants' practices as alleged in this Complaint constitute unfair business practices in violation of the UCL because they are substantially injurious to consumers and any utility of such practices is outweighed by the harm to

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

consumers. Defendants' practices violate California's legislative policy of protecting patients and consumers by prohibiting the marketing, sale, and distribution of new drugs that have not been approved by FDA or the California Department of Health Services. Defendants' practices have caused and are causing substantial injuries to Nexus and to the public. Those injuries are not outweighed by any benefits.

93.    Nexus has lost money or property because of Defendants' unlawful and unfair business practices.

94.    Nexus seeks declaratory and injunctive relief requiring Defendants to cease the unlawful actions alleged herein.

95.    In addition, Nexus is entitled to an award of its attorney's fees under California Code of Civil Procedure section 1021.5.

## COUNT TWO

**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")**

**(Fla. Stat. Ann. § 501.201, *et seq.*)**

96.    Nexus realleges and incorporates by reference each and every allegation set forth in paragraphs 1-95 above, as if fully stated herein.

97.    FDUTPA makes "unlawful" "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

98. FDUTPA also creates a cause of action for "anyone aggrieved" by a violation of FDUTPA to bring an action against "a person who has violated, is violating, or is otherwise likely to violate" the Act. Fla. Stat. Ann. § 501.211.

99. Nexus is "aggrieved" under FDUTPA.

100. Defendants are "persons" who have violated and are violating FDUTPA.

101. Defendants engage in unfair, unconscionable, and deceptive conduct in "trade" and "commerce" in violation of FDUTPA when they unlawfully compound and sell unapproved drugs.

102. Given that Defendants' drugs are unapproved (and therefore potentially dangerous to consumers), Defendants' compounding and sale of their drugs is a practice that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to physicians, medical facilities and patients alike.

103. The practices described herein also offend established public policy regarding the protection of consumers against companies, like Defendants, that engage in unfair methods of competition. Defendants' conduct has caused substantial injury to Nexus that is not outweighed by countervailing benefits to any consumers or competition.

104. Defendants' business acts and practices are also unfair because they have caused harm and injury-in-fact to Nexus for which Defendants have no

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

justification other than to increase, beyond what Defendants would have otherwise realized, their market share and revenue from the sale of unapproved drugs.

105.   Defendants further violated FDUTPA by violating a "statute . . . which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. 501.203(3)(c). Here, Defendants violated the FDCA and Florida's Drug and Cosmetic Act, both of which proscribe unfair methods of competition and unfair, deceptive, and unconscionable acts and practices.

106.   In addition to actual damages which are in excess of $75,000, Nexus is entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. § 501.201, et seq.

## COUNT THREE

### Violation of Connecticut's Unfair Trade Practices Act

### (Conn. Gen. St. § 42-110b)

107.   Nexus realleges and incorporates by reference each and every allegation set forth in paragraphs 1-106 above, as if fully stated herein.

108.   Connecticut's Unfair Trade Practices Act ("CUTPA") prohibits "unfair methods of competition or unfair [ ] acts or practices in the conduct of any trade or commerce." Conn. Gen. St. § 42-110b. Under Connecticut law, an act is "unfair" when it offends public policy as it has been established by statutes, the common law, or otherwise, or when it is immoral, unethical, oppressive or unscrupulous.

109.   Defendants' practices described above are both offensive to public policy, and are immoral, unethical, oppressive and unscrupulous.

110.   Nexus is a competitor of Defendants in that both Nexus and Defendants sell prescription ready-to-use ephedrine sulfate drug products.

111.   Defendants' conduct was in the course of their primary trade or commerce—the selling of compounded drugs.

112.   Defendants' unlawful practices described herein have caused substantial injuries to Nexus and to consumers: the injuries caused by Defendants have been substantial; they are not outweighed by any countervailing benefits to consumers or competitors that the practice produces; and the injuries are ones that Nexus and consumers could not reasonably have avoided.

113.   Within three years of the commencement of this action, Nexus has suffered an actual, ascertainable loss of money or property as a result of Defendants' unlawful trade practices and unfair methods of competition and unfair acts. Defendants' sales of its ready-to-use ephedrine sulfate drug products are the proximate cause of Nexus's losses. Nexus is therefore entitled to damages which are in excess of $75,000 and attorney's fees. Conn. Gen. St. § 42-110g.

114.   Nexus is entitled to declaratory and injunctive relief under CUTPA.

**COUNT FOUR**

**Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law**

**(73 P.S. §§ 201-1 *et seq.*)**

115.   Nexus realleges and incorporates by reference each and every allegation set forth in paragraphs 1-114 above, as if fully stated herein.

116.   Pennsylvania's Unfair Trade Practices and Consumer Protection Law prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as unlawful. 73 P.S. § 201-3.

117.   According to the statute, "unfair methods of competition" induce, *inter alia*, "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." *Id.* § 201-2(4)(ii).

118.   Defendants engage in trade and commerce, and so their actions fall within the ambit of Pennsylvania's Unfair Trade Practices and Consumer Protection Law.

119.   Defendants engage in unfair methods of competition because they advertise their products meeting the FDA requirements for approval under 503A and 503B, when in fact they do not. As such, Defendants have engaged in actions causing likelihood of confusion or misunderstanding as to the approval or certification of their goods.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

120.    Additionally, given that Defendants' drugs are unapproved (and therefore potentially dangerous to consumers), Defendants' compounding and sale of their drugs is a practice that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to physicians, medical facilities and patients alike.

121.    The practices described herein also offend established public policy regarding the protection of consumers against companies, like Defendants, that engage in unfair methods of competition. Defendants' conduct has caused substantial injury to Nexus that is not outweighed by countervailing benefits to any consumers or competition.

122.    Nexus is entitled to damages which are in excess of $75,000, and injunctive relief pursuant to law. 73 P.S. § 201-4.1.

## COUNT FIVE

### Violation of Arizona Consumer Fraud Statute

### (AZ Rev Stat § 44-1521 *et seq.*)

123.    Nexus realleges and incorporates by reference each and every allegation set forth in paragraphs 1-122 above, as if fully stated herein.

124.    Arizona law prohibits the "act, use or employment by any person of any . . . unfair act or practice . . . in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby." AZ Rev Stat § 44-1522 ("AUCL").

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

125.   Arizona also allows for common law claims of unfair competition. The general purpose of unfair competition doctrine in Arizona common law is to prevent business conduct that is contrary to honest practice in commercial matters.

126.   Defendants' practices and actions described above are contrary to honest practice in commercial matters. Defendants deceive their customers into believing that the products provided comply with FDA law and regulations for 503A and 503B compounding pharmacies, when in fact they do not. Additionally, Defendants sell products that are essentially a copy of Nexus's FDA-approved EMERPHED product. Thus Defendants have sought to avoid the cost, time, and effort required to secure FDA approval for their products. This is unfair to Nexus and the general public, as recognized by the FDA in its Guidance documents. Defendants unfairly divert sales from Nexus.

127.   Defendants' unlawful practices described herein have caused substantial injuries to Nexus and to consumers: the injuries caused by Defendants have been substantial; they are not outweighed by any countervailing benefits to consumers or competitors that the practice produces; and the injuries are ones that Nexus and consumers could not reasonably have avoided.

128.   Nexus has suffered an actual loss of money as a result of Defendants' unfair trade practices. Additionally, Nexus has suffered non-monetary losses such as loss of market share, price erosion, loss of goodwill, and other reputational

damage. Nexus is therefore entitled to both damages, which are in excess of $75,000, and injunctive relief.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Nexus respectfully request that this Court enter judgment in its favor:

1. A preliminary and permanent injunction enjoining Defendants, and all related entities under their control, from continuing the unlawful and unfair business practices alleged in this complaint, which injunction has a value to Nexus in excess of $75,000;

2. A judgment that Defendants have violated the UCL;

3. A judgment that Defendants have violated the FDUTPA;

4. A judgment that Defendants have violated the CUTPA;

5. A judgment that Defendants have violated the PUTPL;

6. A judgment that Defendants have violated Arizona law AZ Rev Stat § 44-1522 and common law;

7. Declaratory relief;

8. Damages which are in excess of $75,000 and other monetary relief according to proof;

9. Enhanced damages and other monetary relief according to proof;

10. Attorneys' fees and costs incurred in this action;

11. Prejudgment interest; and

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT

12. Any further relief the Court may deem just and proper.

## VII. **REQUST FOR JURY TRIAL**

Nexus demands a trial by jury on all claims and issues so triable.


Dated: September 8, 2020                    SCHIFF HARDIN LLP

By: */s/ Matthew B. Mock*
MATTHEW B. MOCK

*Attorneys for Plaintiff*
*Nexus Pharmaceuticals, Inc.*

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
NEWPORT BEACH

PLAINTIFF NEXUS PHARMACEUTICALS, INC.'S FIRST AMENDED COMPLAINT