Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Matthew L. Venezia (State Bar No. 313812)
  mvenezia@bgrfirm.com
BROWNE GEORGE ROSS LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone:  (310) 274-7100
Facsimile:  (310) 275-5697

Karla L. Palmer *(pro hac vice pending)*
  kpalmer@hpm.com
HYMAN, PHELPS & MCNAMARA, PC
700 13th Street NW, Suite 1200
Washington, DC 20005
Telephone:  (202) 737-7542
Facsimile:  (202) 737-9329

Attorneys for Defendant
CENTRAL ADMIXTURE PHARMACY SERVICES, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| NEXUS PHARMACEUTICALS, INC., | Case No. 8:20-CV-01506-CJC-JDE |
| Plaintiff, | |
| vs. | **DEFENDANT CENTRAL ADMIXTURE PHARMACY SERVICES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| CENTRAL ADMIXTURE PHARMACY SERVICES, INC., and B. BRAUN MEDICAL INC., | |
| Defendants. | [Filed Concurrently with Declarations of Maria Edisa Gozun, Keith J. Wesley, Michael Koch, Edgar L. Mendaros, Todd Jones, Stan Louie, and John Maloney, PhD, and Request for Judicial Notice] |
| | Judge:  Hon. Cormac J. Carney |
| | Date:   October 19, 2020 |
| | Time:   1:30 p.m. |
| | Crtrm.:  9B |

1668669.1

Case No. 8:20-CV-01506-CJC-JDE

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

**Page**

I.   Preliminary Statement. ....................................................................... 1

II.  Factual and Procedural History. ........................................................ 5

    A.   CAPS fulfills an integral function by compounding ready-to-inject, FDA-approved ephedrine sulfate. ............................................. 5

    B.   Congress's passage of the DQSA in 2013 enables CAPS to prepare ready-to-inject, FDA-approved ephedrine sulfate in large quantities in FDA-inspected and regulated outsourcing facilities. ......... 6

    C.   Nexus is trying to seize a monopoly over a particular dosage of ephedrine sulfate, to the detriment of CAPS, other FDA-approved ephedrine manufacturers, hospitals, doctors, and patients. .................... 8

        1.   Nexus obtains FDA approval, via an alternative, less onerous and expensive new drug application, to sell vials of 5 mg/mL ephedrine sulfate. .......................................................... 8

        2.   Nexus files this anti-competitive lawsuit (and others). ................. 8

III. Nexus's Request for a Preliminary Injunction Should be Denied. .................. 10

    A.   Nexus did not make a clear showing of irreparable harm. .................... 10

        1.   An injunction may issue only upon a showing of clear, probative evidence of "irreparable harm." ................................. 10

        2.   The conclusory, self-serving, speculative declaration of Nexus's Chief Financial Officer is inadequate. ........................... 11

            a.   Loss of customers and market share. ............................... 12

            b.   Price Erosion. .................................................... 13

            c.   Other. ........................................................... 14

    B.   Nexus is not likely to succeed on the merits. ........................................ 15

        1.   Nexus's claims are impliedly preempted by the FDCA. .............. 15

            a.   State-law claims that encroach on a regulatory scheme assigned by Congress to a federal agency are impliedly preempted. ........................................... 15

            b.   The FDA has sole authority to construe and enforce the FDCA. ........................................................ 15

            c.   State-law claims based on violations of the FDCA are almost always impliedly preempted. ........................... 15

## TABLE OF CONTENTS
### (Continued)

**Page**

d.     Nexus's state-law claims based on CAPS's alleged violation of the DQSA's "essentially a copy" provision are impliedly preempted. ................................... 16

e.     Recent decisions in this circuit confirm the wide scope of FDCA implied preemption. .............................. 18

2.     Alternatively, Nexus's claims are subject to dismissal or stay under the primary jurisdiction doctrine. .............................. 19

3.     Alternatively, CAPS is not in violation of the DQSA. ................. 20

a.     CAPS's ready-to-inject ephedrine sulfate is not identical or nearly identical to Nexus's vials of ephedrine sulfate. ............................................................... 20

b.     Alleged non-compliance with the FDA's "non-binding guidance" is an insufficient basis for a violation of the state laws pled by Nexus. ........................ 21

4.     Alternatively, Nexus's Arizona and Pennsylvania state-law claims fail as a matter of law. ...................................................... 22

C.     The balance of hardships tips against an injunction. ............................ 23

D.     The public interest weighs heavily against an injunction. ..................... 23

E.     The requested injunction exceeds this Court's power. .......................... 24

IV.     Conclusion. ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Allergan USA, Inc. v. Imprimis Pharmaceuticals, Inc.*,
2017 WL 10526121 (C.D. Cal. Nov. 14, 2017) ................................. 17, 18, 19, 22

*Allergan USA, Inc. v. Imprimis Phram., Inc.*,
2019 WL 4545960 (C.D. Cal. Mar. 27, 2019) ...................................................... 22

*Allergan USA, Inc. v. Prescribers Choice, Inc.*,
364 F. Supp. 3d 1089 (C.D. Cal. 2019).......................................................... 21, 22

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
738 F.3d 1350 (Fed. Cir. 2013) ........................................................................... 24

*American Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) .............................................................................. 11

*Amylin Pharm., Inc. v. Eli Lilly & Co.*,
2011 WL 5126999 (9th Cir. Oct. 31, 2011) ......................................................... 14

*Borchenko v. L'Oreal USA, Inc.*,
389 F. Supp. 3d 769 (C.D. Cal. 2019)............................................................. 18, 19

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ............................................................................................. 16

*Clark v. Time Warner Cable*,
523 F.3d 1110 (9th Cir. 2008) .............................................................................. 19

*CycleBar Franchising, LLC v. StarCycle Franchise, LLC*,
2020 WL 380442 (C.D. Cal. Mar. 27, 2020) .................................................. 10, 12

*DMF, Inc. v. AMP Plus, Inc.*,
2019 WL 1099982 (C.D. Cal. Mar. 7, 2019) ................................................. 13, 14

*Ear Charms, Inc. v. Bling Jewelry, Inc.*,
2017 WL 2957796 (C.D. Cal. April 11, 2017) (Carney, J.).................................. 11

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ............................................................................................. 10

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Ferring B.V. v. Serenity Pharms., LLC*,
  348 F. Supp. 3d 236 (S.D.N.Y. 2018) ................................................................ 14

*Goldsmith v. Allergan, Inc.*,
  2011 WL 147714 (C.D. Cal. Jan. 13, 2011) ...................................................... 16

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
  2017 WL 10399343 (C.D. Cal. Nov. 17, 2017) ........................................ 11, 12, 23

*Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ...................................................................... 10, 14

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .......................................................................................... 15

*Hope Med. Enter. Inc. v. Fagron Compounding Services, LLC*,
  2020 WL 3803029 (C.D. Cal. July 7, 2020) .................................................. 13, 19

*Johnson v. MetLife Bank, N.A.*,
  883 F. Supp. 2d 542 (E.D. Pa. 2012)................................................................ 23

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
  402 F. Supp. 3d 877 (N.D. Cal. 2019)............................................................... 10

*Loreto v. Procter & Gamble Co.*,
  515 Fed. Appx. 576 (6th Cir. 2013) .................................................................. 16

*McLaughlin v. Bayer Corp.*,
  172 F. Supp. 3d 804 (E.D. Pa. 2016)................................................................ 22

*Pacific Kidney & Hypertension, LLC v. Kassakian*,
  156 F. Supp. 3d 1219 (D. Or. 2016)................................................................. 24

*Perez v. Nidek Co., Ltd.*,
  711 F.3d 1109 (9th Cir. 2013) .................................................................... 15, 16

*Reiter v. Cooper*,
  507 U.S. 258 (1993) ........................................................................................ 19

*Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*,
  375 U.S. 96 (1963) .......................................................................................... 15

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Somers v. Beiersdorf, Inc.*,
__ F. Supp. 3d __, 2020 WL 1890575 (S.D. Cal. April 15, 2020) ................ 18, 19

*State Farm Fire & Casualty Co. v. Amazon.com*,
2018 WL 1536390 (D. Ariz. March 29, 2018).................................................... 22

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,
971 F.2d 401 (9th Cir. 1992) ............................................................................. 22

*Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*,
307 F.3d 775 (9th Cir. 2002) ............................................................................. 20

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*,
585 Fed. Appx. 390 (9th Cir. Oct. 8, 2014) ...................................................... 13

*U.S. Vessel Documentation v. Vessel Holdings 7, LLC*,
2017 WL 10436076 (C.D. Cal. June 8, 2017)..................................................... 11

*VBS Distribution, Inc. v. Nutrivita Labs., Inc.*,
2017 WL 2404919 (C.D. Cal. Jan. 19, 2017), *rev'd on other grounds at*
697 Fed. Appx. 543 (9th Cir. 2017) .............................................................. 10, 12

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ......................................................................................... 10, 25

## STATE CASES

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999)....................................................................................... 21

## OTHER STATE CASES

*Cenatiempo v. Bank of America, N.A.*,
333 Conn. 769 (2019)......................................................................................... 21

*Webber v. Bactes Imaging Solutions, Inc.*,
295 So.3d 841 (Fl. App. 2020) ........................................................................... 21

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

## FEDERAL STATUTES

21 U.S.C - Food, Drug & Cosmetic Act (FDCA) .................................................*passim*

21 U.S.C.
    § 337(a) ........................................................................................................ 15
    § 353b(d)(2) ................................................................................................. 20
    § 360k(a) ...................................................................................................... 16

Drug Quality and Security Act (DQSA) ................................................................*passim*
    § 503B ..................................................................................................*passim*
    Title I ........................................................................................................... 6

## STATE STATUTES

Arizona's Consumer Fraud Act ................................................................................ 22

California Business & Professions Code
    § 17200 ....................................................................................................... 21

Fla. Stat. § 501.203(3)(c) ........................................................................................ 21

Pennsylvania's Unfair Trade Practices and Consumer Protection Law ..................... 22

## RULES

Fed. R. Civ. P.
    Rule 12(b)(6) .............................................................................................. 17
    Rule 65(c) ................................................................................................... 24

## I.        Preliminary Statement.

For over a decade, defendant Central Admixture Pharmacy Services, Inc. ("CAPS") has fulfilled an important need for health care providers and patients across the nation. Ephedrine sulfate was a longstanding, commonly used, FDA-approved formulation that raised the blood pressure of patients who were suffering from hypotension, a dangerous and potentially fatal condition that most often occurs when a patient is under anesthesia. The FDA-approved ephedrine sulfate on the market, however, was not approved for and did not come in a form that was ready to inject into patients. Instead, it came in concentrations that needed to be diluted and in vials or ampules that needed to be drawn into syringes before administration. Health care facilities were thus forced, on their own, to dilute the FDA-approved ephedrine and to draw the diluted ephedrine from vials or ampules into syringes. This process created health and safety risks – *e.g.*, contamination, imprecise measurements, use of the wrong formulation – and additional cost.

CAPS, which owns and operates the nation's largest network of outsourcing facilities and compounding pharmacies, identified and helped to solve the problem. CAPS purchases the FDA-approved ephedrine – *i.e.*, the same vials and ampules that otherwise go directly to hospitals – from one of the many available manufacturers. CAPS then does what health care providers had previously been required to do themselves – *i.e.*, dilutes the FDA-approved ephedrine and draws it into syringes that are ready-to-inject (aka "ready-to-administer") into patients. In short, CAPS ensures the uniformity and safety previously lacking in the preparation and administration to patients of FDA-approved ephedrine and saves health care providers the time, burden, cost, and risk of performing these functions on their own.[1]

---

[1]        Compounding from finished FDA-approved drugs, as opposed to raw bulk substances, is commonly referenced, including herein, as "sterile-to-sterile" compounding. "Ready-to-inject" and "ready-to-administer" are referenced interchangeably herein.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Through the passage of the Drug Quality and Security Act (DQSA) in 2013, Congress amended the Food, Drug & Cosmetic Act (FDCA) to encourage the type of uniform, more tightly regulated, larger-scale compounding of ephedrine performed by CAPS and to discourage the type of ad hoc, unregulated compounding of ephedrine (and other substances) that would otherwise be occurring inside hospitals and at compounding pharmacies.  In particular, through section 503B of the DQSA, Congress authorized and encouraged compounding at "outsourcing facilities" (aka 503B facilities) that are FDA-registered, regulated, and inspected, and that must abide by safety standards applicable to FDA-registered drug manufacturers.  As contemplated by the DQSA, CAPS has compounded its ready-to-administer ephedrine at a 503B outsourcing facility under the close watch of the FDA for the better part of the last decade.

Sterile-to-sterile compounding of ephedrine benefits all interested parties.  The manufacturers of FDA-approved ephedrine profit because they are authorized to sell ephedrine in vials and ampules only; thus they sell substantial quantities of ephedrine to outsourcing facilities like CAPS.  CAPS benefits because it sells substantial quantities of ready-to-inject syringes of FDA-approved ephedrine that hospitals prefer.  Hospitals and patients benefit because the production of the ready-to-inject syringes of FDA-approved ephedrine occurs in outsourcing facilities subject to the heightened FDA-regulation and safety standards, saving hospitals time and cost and mitigating health and safety risk.

Through this action, plaintiff Nexus Pharmaceuticals, Inc. ("Nexus") asks this Court to end the symbiotic system outlined above, and to override the policies, practices, and experienced judgment of the agency (FDA) tasked with enforcing the DQSA.  Nexus seeks a result that is directly contrary to Congress's intent in passing the DQSA, and that would cause serious, tangible harm to CAPS, other manufacturers of FDA-approved ephedrine, hospitals, doctors, and patients alike.  The only beneficiary of the relief sought by Nexus would be Nexus's bottom line.

Nexus is the latest of many FDA-approved manufacturers of vials of ephedrine.  Nexus faced a problem, however, due to the mature and diverse existing market of ephedrine suppliers.  Many health care providers chose not to purchase from Nexus because Nexus is only authorized and able to supply vials that are not ready-to-administer.  Outsourcing facilities like CAPS did not want to purchase from Nexus either because they had positive, existing relationships with other FDA-approved ephedrine suppliers, and it appeared unlikely that Nexus could come close to matching the existing suppliers on price.

Rather than lower its prices or acquire customers through superior product, marketing, or service, Nexus filed this lawsuit (and a half dozen other related cases).  Nexus's case is thick with irony, but devoid of merit.  Nexus cries "unfair competition" even though this litigation is an anti-competitive ploy.  Nexus attempts to use the DQSA to push compounding out of the 503B outsourcing facilities and into the operating rooms and hospital pharmacies, even though Congress passed the DQSA to accomplish the opposite.

Equity frowns on Nexus's gambit.  Nexus's motion for a preliminary injunction should be denied because Nexus has failed to make the clear showing of proof on any of the requisite four factors.

First, Nexus failed to meet its burden of clearly demonstrating a likelihood of irreparable harm.  The lone evidence of irreparable harm is a self-serving, conclusory, unfounded declaration from Nexus's own Chief Financial Officer.  Courts, including this one, have rejected attempts to prove irreparable harm based on similarly weak showings.

Second, Nexus failed to clearly prove a likelihood of success on the merits.  In fact, Nexus's claims are not meritorious and should be subject to dismissal as a matter of law for multiple reasons:

- Nexus seeks to privately enforce the DQSA through the guise of state unfair competition laws.  The FDA, however, is the lone enforcer of the

DQSA; no private litigant can substitute in.  Indeed, the core purpose of the DQSA is to give the FDA greater authority and oversight and to avoid the state-by-state patchwork of regulation that previously led to tragic, fatal consequences.  Nexus's claims are thus impliedly preempted.

- The "primary jurisdiction doctrine" counsels in favor of dismissing or staying this action pending further input or action from the FDA.  As explained by the Acting Director of the Division of Compounded Drugs at the FDA, Maria Edisa Gozun, the FDA has deliberately chosen not to take any action against sterile-to-sterile compounding at FDA-registered outsourcing facilities.  In fact, just days after Nexus's filing of its preliminary injunction motion herein, the FDA issued a public notice that it intends to publish additional guidance on sterile-to-sterile compounding at outsourcing facilities in the near future, which fact alone is dispositive on the issue of FDA's primary jurisdiction here.

- As a competitor, rather than consumer, Nexus lacks standing to bring at least two of the five state-law claims in its complaint.

Third, the balance of equities weighs heavily against an injunction.  The evidence of irreparable harm presented by Nexus is weak, at best, whereas CAPS presents credible evidence that Nexus's requested injunction would shut down the multi-million-dollar, ready-to-inject ephedrine business that CAPS had spent years building prior to Nexus's entry into the market just a few months ago.

Finally, the public interest would be disserved by an injunction.  Now more than ever, courts should do everything within their power to avoid causing disruption, inconvenience, or additional strain on a medical system struggling to battle a global pandemic.  Enjoining CAPS's compounded ephedrine would result in doctors and hospitals returning to less safe, ad hoc compounding of their own – a result that, ironically, Congress enacted the DQSA to avoid.

The motion for a preliminary injunction should be denied.

## II.   Factual and Procedural History.

### A.   CAPS fulfills an integral function by compounding ready-to-inject, FDA-approved ephedrine sulfate.

Ephedrine sulfate is a longstanding, commonly used, FDA-approved formulation used to treat hypotension – *i.e.*, low blood pressure commonly occurring in patients under anesthesia.  Koch Decl., ¶6; Maloney Decl., ¶¶7-9; Louie Decl., ¶¶9-15.  Health care providers have long been able to purchase ephedrine from various well-known manufacturers of FDA-approved drugs.  Koch Decl., ¶6; Maloney Decl., ¶¶7, 10-11.  The FDA-approved ephedrine, however, is approved for and comes solely in vials (or ampules) that are not ready-to-inject and often contain concentrations that are not right for individual patients.  Koch Decl., ¶7; Maloney Decl., ¶¶10-11.

Health care facilities that purchase FDA-approved ephedrine directly from the manufacturer are thus required, on their own, to dilute the ephedrine sulfate to concentrations that can be administered to patients and to draw the diluted ephedrine into syringes that can be injected into patients.  Koch Decl., ¶8; Maloney Decl., ¶14.  This ad hoc drug compounding performed inside hospitals (including inside operating rooms) creates serious safety risks.  Koch Decl., ¶9; Louie Decl., ¶¶20-23; Jones Decl., ¶¶4-12, Exs. H-L.

CAPS is the nation's largest network of outsourcing facilities and admixture (or, "compounding") pharmacies.  Koch Decl., ¶10.  Founded in 1991, CAPS delivers high-quality, same-day admixture services and solutions to hospitals and outpatient facilities across the nation.  *Id.*  CAPS currently owns and operates three 503B FDA-registered outsourcing facilities, and 22 other state-licensed 503A regional pharmacies that dispense labeled, patient-specific prescriptions, including parenteral nutrition and chemotherapy.  *Id.*, ¶11.

Over a decade ago, CAPS identified the problem with FDA-approved

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ephedrine vials and ampules.  To fix the problem, CAPS purchased ephedrine sulfate from FDA-approved manufacturers.  CAPS diluted the ephedrine into concentrations that could be administered to patients.  CAPS drew the diluted ephedrine into syringes that were then supplied to health care facilities.  In other words, CAPS engaged in sterile-to-sterile compounding to prepare ready-to-administer ephedrine. Koch Decl., ¶12; Jones Decl., ¶¶4-7.

CAPS eliminated the burden, cost, and risk health care facilities were incurring when purchasing ephedrine vials/ampules.  The manufacturers of FDA-approved ephedrine did not mind.  It mattered not to their bottom line whether the sale went to CAPS or to the health care facility itself.  And the health care facilities purchasing from CAPS eliminated time, cost, and risk.  Koch Decl., ¶¶13-14; Jones Decl., ¶12, Exs. H-L.

**B.    Congress's passage of the DQSA in 2013 enables CAPS to prepare ready-to-inject, FDA-approved ephedrine sulfate in large quantities in FDA-inspected and regulated outsourcing facilities.**

In 2012, a contaminated batch of medications compounded by a Massachusetts pharmacy, NECC, resulted in 750 sicknesses and 64 fatalities nationwide.  Request for Judicial Notice ["RJN"], Ex. A at H5960.  To protect against a similar tragedy in the future, Congress passed Title I of the Drug Quality and Security Act ("DQSA"), a new section of the Food, Drug, and Cosmetic Act ("FDCA"), on November 27, 2013.  RJN, Ex. A.  Under the DQSA, Congress created a new category of compounding facilities – *i.e.*, "503B facilities" or "outsourcing facilities" – that are subject to heightened FDA regulation but can compound large quantities without the need for individual patient prescriptions.  *Id.*

Congress intended the DQSA to ensure the continued accessibility of compounded medicines, which are integral to the health care system, but with greater and more uniform FDA oversight.  DQSA co-sponsor Representative Waxman described the bill's dual purposes as follows:

> [The DQSA] will give hospitals and doctors the ability to
> access a source of compounded medicines that are made in
> a facility that is subject to stringent FDA quality standards
> and oversight.

*Id.*, H5961.  In other words, through the DQSA, Congress intended to empower the FDA with greater authority to regulate compounders uniformly and closely by encouraging compounding at 503B facilities.

Congress also intended the DQSA to avoid divergent court decisions that had led to piecemeal and at times inconsistent rules governing compounders.  As explained by Representative Waxman:

> Divergent court decisions on the underlying statute had
> forced the agency to cobble together a piecemeal approach
> to regulating compounding pharmacies that was different in
> some parts of the country than in others. That untenable
> legal situation created loopholes that companies like NECC
> were able to exploit.

*Id.*

CAPS's compounding of ready-to-inject ephedrine effectuates the intent of the DQSA.  CAPS's ephedrine compounding occurs exclusively at one of its 503B outsourcing facilities that are closely regulated by the FDA and subject to the same good manufacturing practices and safety standards governing manufacturers of FDA-approved drugs.  Koch Decl., ¶15; Mendaros Decl., ¶¶6-16, Ex. C.  Indeed, the quality, time, experience, and care that occurs at CAPS's outsourcing facilities is a testament to Congress's vision for the DQSA and FDA's work to implement the Act.  Mendaros Decl., ¶¶13-23, Exs. E-G.  Compounding at outsourcing facilities like CAPS's continues to save hospitals and doctors time, burden, and expense, and lessens health and safety risks.  Koch Decl., ¶¶14, 16; Jones Decl., ¶ 12; Mendaros Decl., ¶¶ 22-23.

FDA is fully aware of CAPS's ephedrine sulfate products.  Not only does FDA

regularly inspect CAPS's outsourcing facilities, but every six months, CAPS reports to FDA a list of the formulations, including ephedrine sulfate, that it is preparing at its outsourcing facilities.  Mendaros Decl., ¶¶8-9, Ex. D.

### C. **Nexus is trying to seize a monopoly over a particular dosage of ephedrine sulfate, to the detriment of CAPS, other FDA-approved ephedrine manufacturers, hospitals, doctors, and patients.**

Nexus attempts to portray itself as a company that invested blood, sweat, and tears to create a new and novel FDA-approved drug formulation.  The truth is quite the contrary.

#### 1. **Nexus obtains FDA approval, via an alternative, less onerous and expensive new drug application, to sell vials of 5 mg/mL ephedrine sulfate.**

Nexus did not seek FDA approval for ephedrine generally.  The FDA had approved ephedrine long ago.  There was no need for Nexus to prove the efficacy and safety of ephedrine; decades of use by hospitals did so just fine.  When seeking approval to sell 5 mg/mL ephedrine, Nexus could therefore rely on an alternative 505(b)(2) new drug application that is far less expensive and burdensome than a standard 505(b)(1) application applicable to truly novel new drugs.  Louie Decl., ¶17.

To be clear, Nexus does *not* have approval to manufacture ready-to-inject ephedrine in a syringe or vials of ephedrine in concentrations other than 5 mg/mL, and Nexus does *not* operate a 503B outsourcing facility in which it could create compounded ready-to-inject ephedrine either.  Louie Decl., ¶¶16-18; Maloney Decl., ¶12.  In other words, if CAPS and other compounders ceased producing ready-to-inject ephedrine or were ordered to stop compounding ephedrine in concentrations other than 5 mg/mL, Nexus could *not* fill that void.  Maloney Decl., ¶12.  Customers would instead be forced to engage in "do it yourself" compounding.

#### 2. **Nexus files this anti-competitive lawsuit (and others).**

Just months after obtaining FDA approval to sell vials of 5 mg/mL ephedrine,

Nexus embarked on a (undoubtedly pre-planned, calculated) litigation campaign. Nexus filed this lawsuit, as well as a half-dozen others, and now seeks a preliminary injunction that would force CAPS to stop selling its ready-to-inject 5 mg/mL ephedrine.

Nexus's litigation ploy did not go unnoticed by the FDA – *i.e.*, the agency actually tasked with deciding the questions raised by Nexus. Not once in the nearly a decade since the passage of the DQSA has the FDA taken compliance or enforcement action against any company engaged in sterile-to-sterile compounding for making "essentially copies" of commercially available drug products. Gozun Decl., ¶8. Upon learning of Nexus's attempts to enjoin CAPS and a half-dozen other companies from engaging in the sterile-to-sterile compounding of ephedrine that the FDA had overseen for years, the FDA issued a notice that it would soon be addressing through further guidance the issue raised by Nexus in this case – *i.e.*, When, if ever, does an FDA-registered outsourcing facility violate the "essentially a copy" standard in the DQSA when engaging in sterile-to-sterile compounding? RJN, Ex. B; *see also* Gozun Decl., ¶ 9. Here is the relevant part of the FDA's September 10 announcement, which is set forth in full in Exhibit B.

- The agency has received questions and comments regarding related to its policies for applying the "essentially a copy" provision when outsourcing facilities (https://www.fda.gov/media/98973/download) compound drugs starting with an approved drug rather than a bulk drug substance. FDA plans to address these comments in an upcoming revision to its guidance for outsourcing facilities. The agency also intends to address compounding from approved drugs in revisions to its guidance for pharmacy and physician compounders (https://www.fda.gov/media/98964/download).

Rather than wait for further FDA guidance or enforcement, Nexus persists in asking this Court to issue an injunction based on recommendations that are not just non-binding, but that will be clarified or modified shortly. CAPS hereby demonstrates through substantial evidence, including a declaration from the FDA in support of the opposition, that the motion for an injunction should be denied.

### III.   Nexus's Request for a Preliminary Injunction Should be Denied.

Nexus rightly concedes that a preliminary injunction is an "extraordinary remedy," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008), which may only be awarded "upon a clear showing" of evidence supporting each relevant factor. *Id.* Nexus does not, however, come close to making a clear evidentiary showing supporting any of the factors.

#### A.   Nexus did not make a clear showing of irreparable harm.

##### 1.   An injunction may issue only upon a showing of clear, probative evidence of "irreparable harm."

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), as well as its Supreme Court and Ninth Circuit progeny, held that injunctive relief may be issued only based on persuasive *evidence* of irreparable harm that is otherwise "*likely*" to occur. *Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (emphasis in original), quoting *Winter*, 555 U.S. at 22. Gone are the days when district courts were permitted to issue injunctions based on presumptions or possibilities of harm. *Winter*, 555 U.S. at 22 (reversing preliminary injunction based on "possibility" of irreparable harm, a standard that is "too lenient"). Conclusory, self-serving averments of harm made entirely by the moving party are also now inadequate. *See, e.g.*, *CycleBar Franchising, LLC v. StarCycle Franchise, LLC*, 2020 WL 380442, at *5 (C.D. Cal. Mar. 27, 2020) ("[a] conclusory and self-serving declaration by the head of a plaintiff's company is, standing alone, weak evidence of irreparable harm"), quoting *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 896 (N.D. Cal. 2019); *VBS Distribution, Inc. v. Nutrivita Labs., Inc.*, 2017 WL 2404919, at *5 (C.D. Cal. Jan. 19, 2017) (Carney, J.) (finding evidence of irreparable harm submitted in form of "self-serving declaration of [plaintiff's] CEO" to be speculative and inadequate), *rev'd on other grounds at* 697 Fed. Appx. 543 (9th Cir. 2017).

In sum, if there is no particularized, persuasive evidence of a likelihood of

irreparable harm, then there is no need to analyze any of the other factors; the injunction must be denied.  *See, e.g.*, *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2017 WL 10399343, at *5-6 (C.D. Cal. Nov. 17, 2017) (Carney, J.) (denying motion for a preliminary injunction based on inadequate evidence of irreparable harm); *U.S. Vessel Documentation v. Vessel Holdings 7, LLC*, 2017 WL 10436076 (C.D. Cal. June 8, 2017) (Carney, J.) (same); *Ear Charms, Inc. v. Bling Jewelry, Inc.*, 2017 WL 2957796, at *2-3 (C.D. Cal. April 11, 2017) (Carney, J.) (same).

## 2.   The conclusory, self-serving, speculative declaration of Nexus's Chief Financial Officer is inadequate.

The lone evidence of the irreparable harm that Nexus would purportedly suffer absent an injunction is a declaration of Nexus's Chief Financial Officer, Usman Ahmed, Dkt. 14-6.  The declaration is inadequate for multiple reasons.

As a threshold matter, as explained above, conclusory, self-serving declarations from an officer of the movant are an insufficient basis for a preliminary injunction.  The declaration of Ahmed is both conclusory and self-serving.  Nowhere does Ahmed identify any details supporting his statements – *e.g.*, names of customers, specific orders, amounts of sales.  Nowhere does Ahmed attempt to link any commercial activity to the five states whose laws have been invoked.  Not a single written communication or other document is attached to the Ahmed declaration.  Indeed, the declaration says little about whether Ahmed is even qualified to testify on the subjects on which he opines.  To the extent the Ahmed declaration has sufficient foundation to be even admissible (which is questionable), the declaration is a classic example of a conclusory, self-serving declaration that should be given little, if any, weight.  *American Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (affidavits from plaintiff's executives describing effects on business were "conclusory and without sufficient support in facts"; preliminary injunction reversed).

Even if the Ahmed declaration is considered more closely, the types of harm identified therein are either compensable through damages, or not credibly explained, or both.

### a.   Loss of customers and market share.

Nexus complains that it will lose customers and market share absent an injunction. Lost customers and market share, however, are not "irreparable" harm. Those forms of harm can be remedied by monetary damages.[2] *See, e.g.*, *Harbor Breeze Corp.*, 2017 WL 10399343, at *5 ("Even if Plaintiffs do experience the monetary loss they claim, an award of damages, if warranted, would adequately remedy that loss"); *VBS Distribution*, 2017 WL 2404919, at *5 ("The Ninth Circuit has consistently held that purely economic losses do not constitute *irreparable* harm and can be adequate compensated by damages") (emphasis in original).

Nexus's position suffers from additional flaws. Even if lost customers and market share could be viewed as "irreparable harm," Nexus has not presented any concrete, particularized evidence of the customers or market share it would purportedly lose. In many instances, Nexus describes simply a "possibility" of harm, which, as described above, is inadequate as a matter of law. For example, Ahmed says Nexus "may earn only approximately 20% of projected sales," Ahmed Decl., ¶21, "may never recover this market share," *id.* at ¶24, and "expects that many customers would not shift to buy Emerphed," *id.* at ¶25. These are exactly the types of speculative, possibilities of harm that the Supreme Court and the Ninth Circuit have held to be inadequate, particularly post-*eBay*. *See, e.g.*, *CycleBar Franchising*,

---

[2]   Nexus notes that one of the five claims it filed, the California UCL claim, does not authorize damages. But Nexus has made no showing that any of its purported lost sales would occur in California. Indeed, Nexus has made no showing regarding the scope of commercial activity and/or alleged harm it would suffer in any of the five states within the scope of Nexus's claims. Regardless, Nexus's argument suffers from the myriad other deficiencies described above.

2020 WL 3840442, at *5 (plaintiff's executive's declaration about "what she predicts that customers 'may do' or are 'likely to do,' or what 'will inevitably' happen" were deemed inadequate to establish irreparable harm); *see also Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 Fed. Appx. 390, 391 (9th Cir. Oct. 8, 2014) (reversing grant of preliminary injunction where "[t]he fact that Sunlight's reputation *might* be harmed by the marketing of TLS's products does not establish that irreparable harm to Sunlight's reputation is *likely*") (emphasis in original).

The cases Nexus relies upon are distinguishable. In *Hope Med. Enter. Inc. v. Fagron Compounding Services, LLC*, 2020 WL 3803029 (C.D. Cal. July 7, 2020), the plaintiff presented evidence of specific lost customers, one of which appeared even to confuse the plaintiff with the defendant. *Id.* at *18. Furthermore, Judge Snyder emphasized that the market in question there was a "two-player market," which indicated that any sale lost by the plaintiff will go to the defendant. *Id.* at *19. Neither circumstance is present here. Nexus presented zero evidence of specific customers lost. And Nexus presented zero evidence that a customer purchasing from CAPS would instead purchase from Nexus.

In *DMF, Inc. v. AMP Plus, Inc.*, 2019 WL 1099982 (C.D. Cal. Mar. 7, 2019), Judge Snyder considered a robust and diverse record of prior and likely future loss, including testimony from an independent third party. *Id.* at *11-14. Moreover, *DMF* was a patent case, where the relevant higher court (the Federal Circuit) has held that the ability to exclude use of a patent is "the principal value of the patent." *Id.* at *11. Here, the relevant higher court (the Ninth Circuit) has instead emphasized that a likelihood of irreparable harm must be clearly proven, and the unique values of patent law are neither present nor pertinent.

### b.   Price Erosion.

Nexus claims that it will suffer "price erosion" absent an injunction. Once again, there is no specific, probative evidence to support this argument. Mr. Ahmed simply speculates as to what would happen "[if] Nexus has to reduce prices."

Ahmed Decl., ¶29.  His speculation is insufficient.  *Ferring B.V. v. Serenity Pharms., LLC*, 348 F. Supp. 3d 236, 245-56 (S.D.N.Y. 2018) (finding inadequate the movant's claim that "there may be permanent price erosion" and denying preliminary injunction).

The lowering of prices is furthermore another form of harm that, if proven, can be compensated through damages.  It is not difficult for an expert witness (or even a mathematically competent lay witness) to calculate the difference between the price that would have been charged and what was actually charged.

Nexus relies solely on *DMF*, the district court decision that is following Federal Circuit law in the patent context.  That decision is neither binding nor persuasive, particularly in the non-patent realm.

### c.     Other.

Nexus attempts to raise "other" purported "irreparable harms."  For example, Nexus says it relied on projected sales as part of its business and growth plans.  Nexus also describes possible layoffs or possible losses of financing or possible disruption to Nexus's product pipeline.  All of these "other" forms of harm are wholly speculative.  There is no identification of the actual terms of the financing, the identity of the financier, or the precise status of the loan.  There is no identification of the actual company positions that will be lost (and why that *reduction* in cost would irreparably harm Nexus).  There is no specification as to what, if any, other products are "in the pipeline," whether they are commercially viable, and/or how they are tangibly being affected.  In short, like all of the forms of "irreparable harm" Nexus may purportedly suffer, the "other" category is "grounded in platitudes rather than evidence" and is thus inadequate.  *Herb Reed Enters.*, 736 F.3d at 1251.

The Court's analysis can end here:  Nexus's failure to prove a likelihood of irreparable harm mandates that the motion for preliminary injunction be denied.  *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 2011 WL 5126999, at *3 (9th Cir. Oct. 31, 2011) (where inadequate showing of irreparable harm, no need to address other

factors).  CAPS will nevertheless proceed to discuss the other three factors, each of which weighs heavily against issuance of a preliminary injunction as well.

**B.      Nexus is not likely to succeed on the merits.**

       **1.      Nexus's claims are impliedly preempted by the FDCA.**

Nexus claims that CAPS violates the unfair competition laws of five states because CAPS is compounding "essentially a copy" of Nexus's 5 mg/mL ephedrine sulfate, which is prohibited under the DQSA sections of the FDCA.  Nexus's state-law claims, which are based entirely on a standard in a federal statute that Congress has authorized the FDA alone to enforce, are impliedly preempted.

       **a.      State-law claims that encroach on a regulatory scheme assigned by Congress to a federal agency are impliedly preempted.**

"The purpose of Congress is the ultimate touchstone" to any preemption analysis.  *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963).  State law is impliedly preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 72-74 (1941).

       **b.      The FDA has sole authority to construe and enforce the FDCA.**

21 U.S.C section 337(a) of the FDCA states that "proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States."  Therefore, "[a]lthough citizens may petition the FDA to take administrative action . . . private enforcement of the statute is barred. . . ." *Perez v. Nidek Co., Ltd.*, 711 F.3d 1109, 1119 (9th Cir. 2013); *see also* Gozun Decl., Ex. B.

       **c.      State-law claims based on violations of the FDCA are almost always impliedly preempted.**

Because Congress has assigned exclusive enforcement and implementation of the FDCA to the FDA, private enforcement of the FDCA, even if under the guise of

state-law claims, is almost always impliedly preempted.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350, 353 (2001) (state-law claims based on violations of FDCA disclosure requirements impliedly preempted because "this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme").  The lone exception to preemption is where a state-law claim fits into a "narrow gap":  "The plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted by § 360k(a), but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*)."  *Perez*, 711 F.3d at 1120.  (emphasis in original) (internal quotations and citations omitted); *see also Goldsmith v. Allergan, Inc.*, 2011 WL 147714, at *2-3 (C.D. Cal. Jan. 13, 2011) ("a plaintiff may not ground his claims on violations of the FDCA" or use "state unfair competition laws as a vehicle to bring a private cause of action that is based on violations of the FDCA") (internal citations omitted).  Nexus's claims here do not fit within the narrow gap, and are based on a section of the FDCA (the DQSA) with an express purpose of avoiding state-by-state interpretation and enforcement of standards governing outsourcing facilities like that of CAPS.

> d. **Nexus's state-law claims based on CAPS's alleged violation of the DQSA's "essentially a copy" provision are impliedly preempted.**

There is no reasonable dispute here that Nexus is suing because CAPS is purportedly violating the DQSA's "essentially a copy" provision.  The complaint is littered with cites to Title 21 of the U.S. Code, and the complaint attaches and relies heavily on non-binding FDA guidance related to Section 503B of the DQSA.  Indeed, but for the DQSA, the phrase "essentially a copy" would be meaningless.  Under these circumstances, *Buckman* and *Perez* mandate that this Court reserve judgment on CAPS's actions and defer to the FDA.  *See also Loreto v. Procter & Gamble Co.*, 515 Fed. Appx. 576, 579 (6th Cir. 2013) ("The [FDCA's] public

1668669.1

-16-

Case No. 8:20-CV-01506-CJC-JDE

enforcement mechanism is thwarted if savvy plaintiffs can label as arising under a state law for which there exists a private enforcement mechanism a claim that in substance seeks to enforce the FDCA.").

Another judge within this district, when confronted with this very same circumstance, agreed that a federal court is not the proper body to interpret or enforce the "essentially a copy" provision.  In *Allergan USA, Inc. v. Imprimis Pharmaceuticals, Inc.*, 2017 WL 10526121, at *8 n.1 (C.D. Cal. Nov. 14, 2017) ("*Imprimis I*"), the drug manufacturer Allergan sued a compounding pharmacy, Imprimis, alleging that Imprimis violated California unfair competition law because Imprimis ran afoul of the very same "essentially a copy" provision in section 503B of the DQSA that is invoked by Nexus.  When ruling upon a motion to dismiss under Rule 12(b)(6), Judge Carter held that Allergan's claim based on the "essentially a copy" legal standard was precluded as a matter of law.  He reasoned that the "essentially a copy" rule "implicates various exceptions that 'directly implicate the FDA's rulemaking authority.'"  *Id.*  He refused to entertain a claim based on the "essentially a copy" standard even though the FDCA defines that term "because the statutory definition is rife with exceptions that the FDA must first determine."  *Id.*

Judge Carter got it right.  Although attempts to privately enforce the FDCA through state statutes are usually impliedly preempted, attempts to privately enforce the "essentially a copy" provision of the DQSA are especially inappropriate.

Private enforcement of the DQSA, and particularly the amorphous "essentially a copy" standard that is subject to ongoing FDA review and interpretation, would result in divergent state-by-state rules and regulations governing compounding – the exact problem that Congress found as a cause of the NECC tragedy and that motivated Congress to enact the DQSA.  This case is a perfect example of why the DQSA gave FDA exclusive authority over outsourcing facilities.  If Nexus were to obtain the relief it seeks, then ephedrine sulfate formulations could not be produced at 503B outsourcing facilities in one or more of five states:  California, Florida,

Pennsylvania, Arizona, or Connecticut. Those same formulations could, however, be produced at 503B outsourcing facilities in 45 other states.

Were Nexus to succeed here, other claims based on other compounded medications would undoubtedly follow. The resulting state-by-state and drug-by-drug restrictions on compounding would make it impossible for the FDA to establish uniform policy and would judicially override Congress's purpose in passing the DQSA.

Further, because there is no FDA-approved, ready-to-use ephedrine sulfate, private enforcement of the DQSA would have the effect here of requiring doctors and hospitals to engage in "do-it-yourself" compounding at the hospital or local pharmacy level. This is exactly what the DQSA sought to eliminate in favor of more heavily and uniformly regulated 503B outsourcing facilities.

In less than a decade, through Congress's passage of the DQSA and the FDA's interpretation and enforcement thereof, we have come a long way from the NECC tragedy. All of that progress should not be reversed, particularly for the sole purpose of making Nexus more money.

e.     **Recent decisions in this circuit confirm the wide scope of FDCA implied preemption.**

Two recent decisions in this circuit support and expand upon the position taken by Judge Carter in *Imprimis I* and advocated by CAPS herein.

In *Borchenko v. L'Oreal USA, Inc.*, 389 F. Supp. 3d 769 (C.D. Cal. 2019), Judge Klausner granted a motion to dismiss a California UCL claim on the basis of implied preemption by the FDCA. Judge Klausner rejected the plaintiff's attempt, like Nexus's attempt herein, to invoke California's Sherman Law, holding that "[t]he fact that Plaintiff's claim is technically brought under the UCL and the Sherman Law does not override the fact that Plaintiff explicitly requests relief which lies squarely within the province of the FDA." *Id.* at 773.

In *Somers v. Beiersdorf, Inc.*, __ F. Supp. 3d __, 2020 WL 1890575, at *1

(S.D. Cal. April 15, 2020), Judge Burns confronted another attempt to use California's UCL as a proxy for private enforcement of the FDCA. Like Judge Klausner in *Borchenko*, Judge Burns held that the plaintiff's state-law claim was impliedly preempted by the FDCA as a matter of law. Judge Burns noted that new drug approval is "a process that is uniquely federal," *id.* at *4, and "the FDCA's premarket approval process, which requires individual determinations by the FDA, does not afford space for non-federal enforcement." *Id.*[3]

In sum, Nexus has not demonstrated a "likelihood of success" on the merits of claims that are impliedly preempted.

**2.    Alternatively, Nexus's claims are subject to dismissal or stay under the primary jurisdiction doctrine.**

The primary jurisdiction doctrine permits courts to stay or dismiss proceedings pending resolution of a matter within the special competence of an administrative agency. *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008), citing *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993). Primary jurisdiction is a prudential doctrine that permits courts to determine "that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Clark*, 523 F.3d at 1114.

When evaluating primary jurisdiction, courts consider the following factors: "(1) the need to resolve an issue that (2) has been placed by Congress within the

---

[3]    CAPS recognizes that Judge Snyder held in *Hope Medical* that she had the power to adjudicate, via the California UCL, the plaintiff's claims that paralleled the FDCA. The parties therein, however, did not submit the legal authority above or brief the arguments above. In addition, *Hope Medical* does not involve the sterile-to-sterile compounding in question here that the FDA has endorsed (and will soon speak further on). Finally, CAPS respectfully submits that the analysis in *Imprimis I*, *Borchenko,* and *Somers* is more persuasive and pertinent than the analysis in *Hope Medical*.

jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002).

This case is a textbook example of when the primary jurisdiction doctrine should be applied.  Pursuant to the DQSA, Congress recognized the need for expertise and uniformity in the administration of the outsourcing facility industry, and thus placed that administration within the exclusive jurisdiction of the FDA.

Nor should the Court be concerned that the FDA will never weigh in.  The FDA has gone on public record, undoubtedly in direct response to Nexus's litigation campaign, that it intends to issue new guidance on sterile-to-sterile compounding by outsourcing facilities in the near future.  RJN, Ex. B.  Moreover, the FDA authorized a declaration in support of CAPS's opposition to a motion for a preliminary injunction, finding the declaration to be "in the public interest because it would discourage an interpretation of the relevant provisions that could be potentially inconsistent with FDA's interpretation and future enforcement actions."  Gozun Decl., ¶5, Ex. B.

Although this case should be impliedly preempted as a matter of law, and therefore there is no need to address the primary jurisdiction doctrine, the doctrine clearly applies as well.

### 3. **Alternatively, CAPS is not in violation of the DQSA.**

#### a. **CAPS's ready-to-inject ephedrine sulfate is not identical or nearly identical to Nexus's vials of ephedrine sulfate.**

The DQSA defines "essentially a copy" to mean, in relevant part, "a drug that is identical or nearly identical to an approved drug."  21 U.S.C. § 353b(d)(2).  As a practical matter, and from a clinical and health-and-safety perspective, the CAPS ready-to-inject ephedrine sulfate is materially different from Nexus's vials.  Maloney

-20-

Decl., ¶¶13-15; Louie Decl., ¶24.

     **b.**  **Alleged non-compliance with the FDA's "non-binding guidance" is an insufficient basis for a violation of the state laws pled by Nexus.**

  Nor can Nexus resort to application of the FDA's non-binding guidance on what constitutes "essentially a copy" under the DQSA.  The claims filed by Nexus require a violation of an actual law or regulation, not a violation of non-binding guidance.  *See* Dkt. 14-3, Mock Decl., Ex. 2 ("This guidance represents the current thinking of the Food and Drug Administration (FDA or the Agency) on this topic. It does not create any rights for any person and is not binding on FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations.").  Because the non-binding FDA recommendations are not law, their alleged violation cannot form the basis of Nexus's UCL claim (or other similar state-law unfair competition claims).  *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (Section 17200's unlawful prong "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."); *Webber v. Bactes Imaging Solutions, Inc.*, 295 So.3d 841, 844 (Fl. App. 2020) (a violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes ... unfair, deceptive, or unconscionable acts or practices" violates the FDUTPA) (quoting Fla. Stat. § 501.203(3)(c)); *Cenatiempo v. Bank of America, N.A.*, 333 Conn. 769, 790 (2019) (unfair conduct under CUTPA includes that which "offends public policy as it has been established by statutes, the common law, or otherwise").[4]

  *Allergan USA, Inc. v. Prescribers Choice, Inc.*, 364 F. Supp. 3d 1089 (C.D.

---

[4]  While the same result should follow under either Arizona's or Pennsylvania's unfair competition laws, as discussed below, Nexus does not have standing to bring those claims, and as such, CAPS will not engage in an in-depth analysis of the merits of such claims.

Cal. 2019) ("*Prescribers Choice*") and *Allergan USA, Inc. v. Imprimis Phram., Inc.*, 2019 WL 4545960 (C.D. Cal. Mar. 27, 2019) ("*Imprimis II*") do not compel a different conclusion. In *Prescribers Choice* and *Imprimis II*, Judge Carter held that where compounders were in clear violation of plain, unambiguous language of the DQSA, but nonetheless complied with and relied upon FDA guidance in good faith, they would not be held liable. *Prescribers Choice*, 364 F.Supp.3d at 1106-07, *Imprimis II*, 2019 WL 4545960, at \*8. In other words, Judge Carter carved out a "safe harbor" based on action that he held violated the plain language of the DQSA, but that was nevertheless consistent with FDA guidance interpreting the statute. Judge Carter did *not* hold that violation of non-binding guidance could form the basis of a state unfair competition claim. And like Judge Carter ruled in *Imprimis I*, this Court should never get to the non-binding guidance at all because the "essentially a copy" standard herein is simply not for courts to interpret or enforce.

### 4. **Alternatively, Nexus's Arizona and Pennsylvania state-law claims fail as a matter of law.**

Although all of Nexus's claims fail as a matter of law for the reasons described above, it should be noted that Nexus does not have standing to bring a claim under either Arizona's Consumer Fraud Statute,[5] or Pennsylvania's Unfair Trade Practices and Consumer Protection Law[6] because those statutes can only be enforced by

---

[5] *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (holding that "the clear intent of [Arizona's Consumer Fraud Act] is to protect unwary buyers from unscrupulous sellers" and affirming dismissal of claim by wine distributor against wine supplier); *see also State Farm Fire & Casualty Co. v. Amazon.com*, 2018 WL 1536390, at \*4 (D. Ariz. March 29, 2018) ("The purpose of the CFA is to provide injured consumers with a remedy to counteract the disproportionate bargaining power often present in consumer transactions.") (internal quotations and citations omitted).

[6] *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 831 (E.D. Pa. 2016) ("To state a plausible claim under the UTPCPL, a complaint must allege that: (1) [plaintiff] purchased or leased goods or services primarily for a personal, family, or

consumers.

For all of the reasons above, Nexus has failed to sustain its burden of proving a likelihood of success on the merits of its claims.

## C.    The balance of hardships tips against an injunction.

"An injunction may not issue unless the balance of hardships tips sharply in favor of the moving party." *Harbor Breeze Corp.*, 2017 WL 10399343, at \*5.  The balance of hardships here tips sharply *against* Nexus.

Nexus's requested injunction would shut down a multi-million dollar business that is closely regulated by the FDA on the basis of claims that are the subject of multiple meritorious defenses.  Koch Decl., ¶¶17-23.  Even if this Court believed there to be some potential merit to Nexus's claims (which, as explained above, there is not), the hardship that an injunction would inflict upon CAPS is too great for equity to tip in favor of Nexus.  That is particularly so when counter-balancing the harm to CAPS with Nexus's inability to prove any irreparable harm.

## D.    The public interest weighs heavily against an injunction.

Perhaps the most important interests that would be adversely affected by issuance of Nexus's requested injunction are those of the hospitals, doctors, and patients who have relied for years (and continue to rely on a daily basis) on CAPS's easy-to-use, affordable, injectable ephedrine.  Nexus presents zero evidence, as opposed to argument, regarding the public interest; not a single declaration from a hospital or other third party.  On the other hand, CAPS's evidence, which includes documents and testimony from third parties, demonstrates that an injunction would

---

household purpose; (2) [plaintiff] suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL.") (internal quotations and citations omitted); *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 548 (E.D. Pa. 2012) ("[S]tanding does not extend to a plaintiff lacking any commercial dealings with the defendant, . . . or to a party who made no purchase.") (internal quotations and citations omitted).

result in substantial disruption to hospitals, doctors, and patients.  Louie Decl., ¶¶25-29, Ex. N; Jones Decl., ¶¶4-13, Exs. H-L; Mendaros Decl., ¶22; Koch Decl., ¶16; Maloney Decl., ¶¶8, 14.

Other courts have denied injunctive relief "upon finding that an injunction would negatively affect the well-being and even convenience of patients and consumers." *Pacific Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1232 (D. Or. 2016) (citing cases).  An injunction here would be far worse than just inconvenient.  It would cause very real and very substantial disruption to the operation of health care facilities and the health and safety of patients nationwide at a unique moment in history when everything possible should be done to mitigate the strain on hospitals, doctors, and patients.

**E.     The requested injunction exceeds this Court's power.**

For all of the reasons set forth above, this is not a close call:  No injunction should issue.  It should be noted for the record, however, that the form of injunction sought by Nexus has no support in the law either.  Nexus asks for a nationwide injunction to be issued based on the laws of five states.  No court though has the power to issue a nationwide injunction based on five state statutes.  A nationwide injunction here would constitute clear and reversible error.  *Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1358-60 (Fed. Cir. 2013) (reversing nationwide injunction based on violation of California UCL as violation of the Commerce Clause of U.S. Constitution).[7]

---

[7]     Any injunction would also require the posting of a bond that would be adequate to remedy the millions of dollars lost by CAPS if such injunction were later held to be erroneous.  Fed. R. Civ. P. 65(c).

## IV.  Conclusion.

Although the parties disagree on much, they are in agreement that a preliminary injunction is an "extraordinary remedy," *Winter*, 555 U.S. at 22, which may only be awarded "upon a clear showing" of evidence supporting each relevant factor. *Id.* Nexus moves for an injunction based on a single, self-serving, conclusory declaration of irreparable harm, in a case where there is not just one, but multiple, strong defenses. The result of the injunction would be substantial harm to CAPS, other drug manufacturers, the ephedrine market as a whole, and hospitals and patients. Nexus did not come close to making the requisite clear evidentiary showing on any of the relevant factors. The motion for a preliminary injunction should be denied.

Dated:  September 28, 2020

BROWNE GEORGE ROSS LLP
    Keith J. Wesley
    Matthew L. Venezia

HYMAN, PHELPS & MCNAMARA, PC
    Karla L. Palmer *(Pro Hac Vice Pending)*

By:  */s/*    Keith J. Wesley

Attorneys for Defendant
Central Admixture Pharmacy Services, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2020, I electronically filed the foregoing **DEFENDANT CENTRAL ADMIXTURE PHARMACY SERVICES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

SCHIFF HARDIN LLP
Matthew B. Mock
5000 Birch Street
West Tower, Suite 3000
Newport Beach, CA 92660
Telephone: 949.623.2000
Facsimile: 949.623.2802
mmock@schiffhardin.com

SCHIFF HARDIN LLP
John K. Hsu
901 K Street NW, Suite 700
Washington, DC 20001
Telephone: 202.778.6467
Facsimile: 202.778.6460
jhsu@schiffhardin.com

SCHIFF HARDIN LLP
Imron T. Aly
233 So. Wacker Drive, Suite 7100
Chicago, Ill  60606
Telephone: 312.258.5500
Facsimile: 312.258.5600
ialy@schiffhardin.com

_____
Claudia Bonilla