Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Matthew L. Venezia (State Bar No. 313812)
  mvenezia@bgrfirm.com
BROWNE GEORGE ROSS LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone No.:  310-274-7100
Facsimile No.:  310-275-5697

Karla L. Palmer (*Pro hac vice pending*)
  kpalmer@hpm.com
HYMAN, PHELPS & MCNAMARA, PC
700 13th Street NW, Suite 1200
Washington, DC 20005
Telephone:  202-737-7542
Facsimile:  202-737-9329

Attorneys for Defendant
CENTRAL ADMIXTURE PHARMACY SERVICES, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| NEXUS PHARMACEUTICALS, INC., | Case No. 8:20-cv-01506-CJC-JDE |
| Plaintiff, | |
| vs. | **DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| CENTRAL ADMIXTURE PHARMACY SERVICES, INC., and B. BRAUN MEDICAL INC., | |
| Defendants. | |
| | Judge:  Hon. Cormac J. Carney |
| | Date:   October 19, 2020 |
| | Time:   1:30 p.m. |
| | Ctrm:   9B |

1668673.1

DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION

# **DECLARATION OF STAN LOUIE**

I, Stan Louie, declare as follows:

1.      I have been retained as an expert witness in the above-entitled action.  I have firsthand, personal knowledge of the facts set forth below and if called as a witness could competently testify thereto.

*Qualifications*

2.      I am a Professor of Clinical Pharmacy at the University of Southern California, School of Pharmacy.  I am the Director of the Clinical Experimental Therapeutics Ph.D. and M.S. programs at USC.  I was recently appointed Deputy Director of the Ginsburg Institute of Biomedical Technology, where I lead drug development initiatives.

3.      I received my PharmD from the University of California, San Francisco in 1987.  After receiving my degree from UCSF, I continued my post-doctoral training at the Pacific Presbyterian Medical Center in San Francisco (now California Pacific Medical Center, Pacific Campus).  Following my post-doctoral training, I began my academic career as an Assistant Professor at USC, where I have advanced to become a Full Professor.

4.      For decades, and up until two years ago, I practiced in intensive care units in acute hospital and ambulatory settings.  My clinical specialties include managing immuno-compromised patients, such as cancer, organ transplant, and HIV-infected patients.

5.      In addition to my clinical experience, I have over 30 years of experience in drug development and research.  In particular, I have focused on advancing new drug candidates through the pre-clinical and clinical FDA approval processes.

6.      Much of my work has been funded by federal agencies (e.g., National Institute of the Health, National Science Foundation, Department of Defense),

private foundations (e.g., WM Keck and Perkins Foundations), and pharmaceutical companies.

7.    I am a member of the United States Pharmacopeia, which works with the Food and Drug Administration (FDA) to establish both standards for drugs, dietary supplement products, and excipients.

8.    During my 30 years of tenure at USC, I have taught more than six thousand pharmacy students in the classroom setting.  In addition, I have personally trained over 20 graduates (Ph.D. or M.S.) or professional students (e.g., M.D., Ph.D. and PharmD) in laboratory-based and clinical translation.

*Ephedrine Pharmacology*

9.    I am very familiar with ephedrine through, among other things, my education, my research in pharmacy studies, and my observations, experiences, and work in hospitals, including operating rooms.

10.    Ephedrine (or phenethylamine) is the active pharmaceutical ingredient (API) found in various marketed parenteral (i.e., injectable) generic products.

11.    Ephedrine was first isolated in 1885 and was later re-discovered in the early 1920s, at which point it began to be mass produced for commercialization.

12.    Parenteral ephedrine has been used, and compounded by pharmacists, for decades.  The compounding of parenteral (i.e., injectable) products was common even prior to the industrialization of the pharmaceutical industry.

13.    The vasoactive properties of ephedrine (i.e., affecting the diameter of blood vessels) led to the development of FDA-approved parenteral products, which are used in patients who experience a rapid drop in their blood pressure or hypotensive episodes.

14.    Ephedrine is commonly administered to patients receiving general anesthesia, which occurs in an operating room.  After initial intravenous (IV) administration of anesthetics (a/k/a induction), continuous infusion of anesthesia is

required to maintain a patient in the hypnotic state during the surgical process. Since anesthetics have muscle relaxant properties, relaxation of the smooth muscle found in blood vessels can cause vasodilation, which can lead to a rapid drop in blood pressure (hypotension).  To maintain normal range of blood pressure, vasoconstrictive agents such as ephedrine are often used.

15.	As one common example, ephedrine is frequently used to maintain normotension in patients receiving spinal or epidural anesthesia.  This anesthetic strategy is most often used in obstetric procedures, where the administration of spinal anesthetics has been found to result in hypotension in 80% of patients. Ephedrine has less alpha-adrenergic action on the uterine vasculature and is thus able to preserve uterine blood flow, thus allowing blood flow to the unborn child. Ephedrine has become the pharmacologic choice in this clinical scenario, as well as many others.

***Nexus's Emerphed and CAPS's Ephedrine Sulfate Compounded Formulations***

16.	Emerphed® is Nexus Pharmaceutical's ("Nexus") branded generic product containing ephedrine sulfate at a concentration of 5 mg/mL in 0.9% sodium chloride in a vial.

17.	The FDA approved Emerphed 10 mL vials in April 2020.  I reviewed the FDA summary of the 505(b)(2) application submitted by Nexus to the FDA.  In this review, it states the rationale for FDA approval of Nexus' proposed 5 mg/mL ephedrine sulfate product.  The 505(b)(2) application process is far less expensive and burdensome than the standard 505(b)(1) new drug application process.

18.	Emerphed comes in a 10 mL glass container vial.  Therefore, it is not ready to administer into a patient.  The Nexus ephedrine product must be further manipulated before it can be used on – i.e., injected into – a patient.  More specifically, the Nexus ephedrine product must be withdrawn with a syringe fitted with a needle, which must be re-labeled, before administration to a patient.

1668673.1

-3-

DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

19.    The CAPS ephedrine sulfate 5mg/ml syringe product is a compounded ephedrine product using Endo/Par's FDA-approved finished product as the starting material.  The starting material is diluted at CAPS's FDA registered 503B outsourcing facility, following its standard operating procedure (SOP).  After completing the compounding process, the product is filtered. The diluted product is packaged pursuant to FDA's cGMP regulations, in a labeled sterile syringe, and is delivered as a "ready to administer" or "inject" dosage form.  The CAPS finished syringe product does not require additional transfer or manipulation into a delivery device in a hospital pharmacy or operating room.

20.    As a general matter, ready-to-administer dosage forms are regularly used to eliminate medication errors, a major cause of morbidity associated with in-patient care.  The Institute for Safe Medication Practice (ISMP), is a non-profit international organization dedicated to the promotion of safe medication practices. It has defined "ready-to-administer" as: "An injectable product containing the active drug in solution at the required concentration and volume, presented in the final container (syringe, infusion bag, or elastomeric device), and ready to be administered to the patient."  In contrast, "ready-to-use" is defined as the following: "An injectable product containing the active drug in solution at the required concentration and volume in a vial.  The injectable product is transferred to a final container (syringe, infusion bag, or elastomeric device) for administration to the patient."  A true and correct copy of the ISMP presentation is attached hereto as "**Exhibit M**."

21.    It has been reported that half of medication errors (48%) are most likely to occur during preparation and administration of intravenous medications.  Thus the ISMP has recommended the following:  "To the greatest extent possible, provide adult IV push medications in a "ready-to-administer" form (to minimize the need for manipulation outside of the pharmacy sterile compounding area)" and "Use only

1668673.1

-4-

DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

commercially available or pharmacy-prepared prefilled syringes of appropriate IV solution to flush and lock vascular access devices."

22.     There are clear advantages in using ready-to-administer syringes in the operating room in particular, where large numbers of syringes and administration devices are infusing into the patient.  In the operating room, the physician is not only ensuring adequate anesthetics to the patient, but must also monitor and respond to potentially fatal drug reactions.  In this regard, timing is key.  Seconds or minutes may have a dramatic impact on patient wellness and morbidity.  A ready-to-administer product can be inserted into a patient and immediately increase blood pressure within seconds.  In contrast, it takes time to open a syringe and needle, alcohol wipe down the top of a vial top, insert the empty syringe, withdraw the formulation, and insert into the intravenous assess.  This time difference can have a significant impact on the patient's overall wellness and outcomes.

23.     Even outside the operating room, significant additional activity must occur inside hospitals before Nexus's Emerphed can be administered to patients.  The process, inside a hospital, of transferring Emerphed into a ready-to-administer form risks contamination because the product is withdrawn in a non-sterile environment.  An example of such introduction of contamination is seal "coring" particulate that is introduced when the needle penetrates through the rubber seal which can cut the material (i.e., "coring") and thus introduce particulates into the dosage.  Although this can be prevented by passing the product through a 0.22 µm filter, such a filter is not readily available in a non-pharmacy environment, like a patient's bedside or an operating room.

24.     In my opinion, the fact that CAPS's ephedrine syringes are "ready-to-administer" is a clinically significant difference between the CAPS product and Nexus product.  As explained above, there are substantial differences in the process of using Nexus's ephedrine vials and CAPS's ready-to-administer syringes.  I do not

1668673.1

-5-

DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

believe that a ready-to-administer syringe could reasonably be considered a "copy" or "essentially a copy" of a vial product that requires additional, time-consuming steps to be undertaken prior to injection.

***The Public Interest Would be Harmed if Hospitals and Patients Could Not Receive Ready-to-Administer Ephedrine, Such as the Syringes Produced by CAPS***

25.     It is my understanding that Nexus is requesting a court order to stop CAPS (and potentially others) from compounding its ephedrine sulfate syringe product at its FDA-registered outsourcing facility.

26.     It is my opinion that Nexus's requested court order would cause very real, immediate, and serious adverse consequences to hospitals and patients.

27.     If ready-to-administer ephedrine is ordered off the market, then I believe hospitals will compound ephedrine sulfate internally at, for example, in-hospital pharmacies, under less stringent standards than those required by cGMP guidelines.   Alternatively, in those hospitals that lack the resources to conduct in-hospital compounding, anesthesiologists or doctors themselves will be forced, in the operating room, to draw the ephedrine from vials into syringes.  This presents a variety of safety concerns, including human error and potential contamination.

28.     In addition, the process of making a ready-to-administer ephedrine internally at hospitals increases costs and burden.  When a hospital pharmacy chooses to compound an ephedrine sulfate syringe product, the hospital pharmacy follows the compounding and syringe preparation instructions from the manufacturer.  Hospital pharmacies generally operate in accordance with USP<797> guidelines for sterile compounding, which are significantly less stringent standards than the rigorous cGMP regulations that are applicable to outsourcing facilities.  The final syringe product created within a hospital pharmacy will have a shorter "beyond use date" than that of the medication in the vial, and will need to be used within a much shorter time frame or proper storage conditions for later use.

1668673.1

-6-

DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The syringe will also need to be re-labeled, in order to ensure compliance with applicable standards for safe medication administration.  All of these steps take time and increase costs to the hospital.

29.    Finally, it takes time for a hospital or health care facility to transition to a different form of medication or delivery.  For hospitals and facilities that have been using ready-to-administer ephedrine for a significant time, the sudden forced change to compounding internally from ephedrine vials will likely cause major disruption in administration and patient care.

Executed this 24th day of September 2020, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Stan Louie

1668673.1

-7-

DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2020, I electronically filed the foregoing **DECLARATION OF STAN LOUIE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

SCHIFF HARDIN LLP
Matthew B. Mock
5000 Birch Street
West Tower, Suite 3000
Newport Beach, CA 92660
Telephone: 949.623.2000
Facsimile: 949.623.2802
mmock@schiffhardin.com

SCHIFF HARDIN LLP
John K. Hsu
901 K Street NW, Suite 700
Washington, DC 20001
Telephone: 202.778.6467
Facsimile: 202.778.6460
jhsu@schiffhardin.com

SCHIFF HARDIN LLP
Imron T. Aly
233 So. Wacker Drive, Suite 7100
Chicago, Ill  60606
Telephone: 312.258.5500
Facsimile: 312.258.5600
ialy@schiffhardin.com

Claudia Bonilla